SCHMIDT et al., Appellants, v. RANKIN.

Division One, February 22, 1906.

1.. CHATTEL MORTGAGE: Conversion: Burden. The burden is on the plaintiff mortgagee to show that certain cattle sold through a commission company to defendant were the cattle covered by the mortgage, also to furnish the jury with facts· from which they would be authorized to draw inferences of fact as to the exact number of cattle covered by the mortgage that defendant purchased, in order to charge him with converting them. But where plaintiff produces facts from which the jury may infer that a certain number of those bought by defendant was covered by the mortgage, it is error to tell the jury that plaintiff cannot recover at all if they cannot determine just how many more of the entire number sold were covered by the mortgage.

2. _____: Payment and Subsequent Mortgage By Agent: Acquiescence by Former Mortgagor: Conversion. The owner of cattle had mortgaged them and authorized his agent to sell them at an average price of two dollars per head in excess of the mortgage debt. The agent, without the knowledge of his principal, borrowed money from plaintiff's assignor and secured the loan by a mortgage on the cattle, and with the money paid off his principal's mortgage and sent him the two dollars per head, and then shipped them, and through a commission house a part of them were sold to defendant. Held, that his principal by acquiescing in the act of his agent made the agent's act in becoming the owner of the cattle a legal act, even if the agent's

method of purchase in the first place was objectionable, and, hence, the agent's mortgage was valid, and, being properly recorded, the defendant is liable to the owner of the mortgage notes, as for conversion, for the value of the cattle covered by the mortgage purchased by him.

3. ———: Sale in Open Market: Caveat Emptor: Full Value. The rule of law is that a purchaser of cattle in the open market purchases at his own risk and peril. As between plaintiff mortgagee holding a valid mortgage on cattle, and a defendant who, without knowledge of the existence of the mortgage other than is imputed by its record, purchases them in the open market from a commission house to whom they have been shipped by the mortgagor, both may be said to be innocent purchasers; but the defendant is liable to the true owner, if the seller and ostensible owner is not the true owner, and the fact that he pays full value for them is no defense.

4. ———: Question for Jury: Instruction. Whether or not cattle purchased by defendant in the open market were cattle covered by plaintiff's mortgage is a question of fact for the jury, and if the instructions are proper their finding is final. But if they were improperly instructed, their finding amounts to nothing,

Appeal from Buchanan Circuit Court.—*Hon. Henry M. Ramey*, Judge.

REVERSED AND REMANDED.

*Beardsley, Gregory & Kirshner* for appellants.

(1) The court erred in giving instruction 2 on behalf of defendant. It was error on the part of the court to instruct the jury that though they might believe some of the cattle bought by defendant and by his firm were the cattle covered by the mortgage in controversy, yet if they could not tell the exact number of the cattle covered by the mortgage which were bought by Rankin and his firm, then the plaintiffs could not recover to any extent whatsoever. The plaintiffs were entitled to recover for such number of cattle as they proved to the satisfaction of the jury were covered by the mortgage and converted by defendant or his firm, although they might find that there was a large number, not being able, how-

ever, to exactly determine that larger number. (2) The court erred in giving to the jury instruction 6, on behalf of defendant. This instruction is in direct conflict with instruction 1, and given on behalf of the plaintiffs, and which latter instruction correctly declared the law. Gillett may not have bought the cattle from Hollinger so that he might be said to have become their owner on August 20th, within the usual meaning of those terms. Yet, if he had himself taken the cattle under the authority which he had as agent, to sell, and sold to himself, such a sale to himself was not void, but voidable at the option of Hollinger. Barr v. Randall, 35 Kan. 129; Hoyt v. Latham, 143 U. S. 553; Remick v. Butterfield, 31 N. H. 70; Jennison v. Hapgood, 7 Pick. 1; Bohn v. Davis, 75 Tex. 24; Reddick v. Gressman, 49 Mo. 389; Ellis v. Peck, 45 Ia. 112; Golson v. Ebert, 52 Mo. 271; Johnson v. Outlaw, 56 Miss. 541; Railroad v. Solmer, 123 Fed. 855; Connelly v. Hammond, 51 Tex. 647; Grant v. Beard, 50 N. H. 129; Smith v. Johnson, 71 Mo. 383. The ratification afterward made by Hollinger had the effect of completing the sale as of the date prior to August 20, 1898. Boyle v. Zacharie, 6 Peters 644; Ferris v. Thaw, 72 Mo. 446; Suddarth v. Empire Lime Co., 79 Mo. App. 585; Hume v. Eagon, 73 Mo. 271; Turner v. Chillicothe, etc., Co., 51 Mo. 501; Savings Ass'n v. Morrison, 48 Mo. 273; Express Co. v. Rawson, 106 Ind. 215. The error in instruction 6 was not cured by the giving of instruction 1 for plaintiffs. Imp. Co. v. Ritchie, 143 Mo. 612; State v. Bacon, 147 Mo. 286; State v. McNally, 87 Mo. 658.

*Botsford, Deatherage & Young* and *Rusk & Stringfellow* for respondent.

(1) The trial court should have given respondent's peremptory instruction to the jury to return a verdict for the defendant. (2) The most that could be said in behalf of the appellants on the testimony is, that it leaves

the .question in doubt whether the defendant's cattle were from Skiddy ranch or from the Pierce pasture; but if the evidence leaves the question in doubt, then the plaintiffs are not entitled to recover. Smart v. Kansas City, 91 Mo. App. 586. (3) Gillett had no authority to make the mortgage under which plaintiffs claim, dated August 2, 1898, to Elmore & Cooper. Appellants' brief cites the case of Grant v. Beard, 50 N. H. 129, in support of their contention in favor of the application of the doctrine of ratification. In that case, the New Hampshire Supreme court, in accord with the doctrine which universally prevails in the American courts, held that the principal could not be held to have ratified a transaction on the part of his agent unless he did so with full knowledge of all the facts. The same doctrine is recognized in the case of United States Express Co. v. Rossen, 106 Ind. 215, which is also cited by appellants' counsel In this connection, we call the attention of the court to the fact that the local citation on page 286, in State v. Bacon, 147 Mo. 160, which is cited by appellants' counsel, is a part of the dissenting opinion in that case, of one of the judges of the Supreme Court, and is not a part of the opinion of the court. (4) The adjudication of this court in the case of New England National Bank v. Northwestern National Bank, 171 Mo. 307, is an authority in point that the mortgage in this case by Gillett to Elmore & Cooper is null and void. (5) Complaint is made that defendant's sixth instruction is in conflict with appellants' first instruction, also given by the court. We submit that appellants' first instruction was erroneous and defendant's sixth instruction was proper. If this was so, error cannot be assigned by appellants to the giving of defendant's sixth instruction.

MARSHALL, J. This is an action for the conversion of one hundred and sixty-two head of cattle of

193 Sup—17

the alleged value of $6,000. The action was begun on the 9th of August, 1899. There was a verdict and judgment for the defendant, and the plaintiffs appealed.

### THE ISSUES.

The petition is in two counts, arising out of the fact that the plaintiff, Louis Schmidt, owns one note for $6,000, and the plaintiff, D. A. McPherson, owns the other note for $6,000, both of which were secured by a chattel mortgage on the cattle, alleged to have been converted by the defendant. The answer is a general denial, coupled with a plea that two separate and distinct causes of action are united in the petition. The reply is a general denial.

The case made is this:

In the spring of 1898, Joseph W. Gillett, was the owner of one thousand head of cattle, branded S-T (called S bar T) which were on a ranch in Dickinson county, Kansas, known as the Skiddy Ranch. He moved four hundred head of the cattle to the Pierce Pasture, located about eleven miles northeast of Alta Vista, which pasture was partly in Geary County, and partly in Waubaunsee County.

In May, or the early part of June, 1898, he sold three hundred of the cattle he had so placed in the Pierce Pasture to a third party, who shipped the same to Missouri and sold them. The said three hundred do not figure in this case.

Immediately thereafter, he caused three hundred of the cattle he had left on the Skiddy Ranch to be placed in the Pierce Pasture, to take the place of the three hundred so sold, and to make the number in the Pierce Pasture aggregate four hundred.

In the month of June, 1898, Grant G. Gillett, a brother of Joseph Gillett, arranged with Joseph to purchase the four hundred head of cattle in Pierce Pasture, and the remaining cattle on the Skiddy Ranch. When the transaction was closed it developed that Grant G.

Gillett was acting for Charles R. Hollinger and not for himself. In order to pay for the cattle, Hollinger executed a mortgage on the cattle in the Pierce Pasture to the J. C. Bohart Commission Company, of St. Joseph, and with the proceeds of that loan he, through Grant Gillett, paid Joseph Gillett for said four hundred head in the Pierce Pasture, and what remained on the Skiddy Ranch.

Shortly thereafter, it was agreed between Grant G. Gillett and Hollinger, that Grant G. Gillett should dispose of the cattle so as to secure to Hollinger a profit of two dollars per head.

On the 20th of August, 1898, Grant G. Gillett executed a mortgage on the four hundred head of cattle in the Pierce Pasture, to Elmore & Cooper, of Kansas City, Kansas, to secure two promissory notes of $6,000 each, made by Grant G. Gillett to Elmore & Cooper, due one hundred and fifty days after date; the cattle to remain in the possession of the mortgagor until condition broken. The mortgage was recorded in Dickinson county, Kansas, the residence of the mortgagor, as required by the statutes of Kansas. With the proceeds of that loan, Grant G. Gillett paid off the mortgage that Hollinger had executed to the J. C. Bohart Commission Company, and returned the notes and mortgage to Hollinger, and also paid Hollinger the two dollars a head profit he had agreed to give him.

Elmore & Cooper sold one of the $6,000 notes to the First National Bank of Deadwood, South Dakota, and thereafter, on January 18, 1899, said First National Bank sold said note to the plaintiff, D. A. McPherson, which was before the maturity thereof. Elmore & Cooper sold the other $6,000 note to the Franklin Bank in St. Louis, and thereafter, on the 10th of January, 1899, that bank sold it to the plaintiff, Louis Schmidt.

According to the plaintiff's version, on the 25th of September, 1898, Joseph Gillett gave an order on Ben

Pierce, the owner of the Pierce Pasture, to deliver the four hundred head of cattle in that pasture to James Davis, and Grant G. Gillett indorsed that order. On Sunday, September 25, 1898, Davis went to Alma, which was near the Pierce Pasture, and the next day he proceeded to the Pierce Pasture, and stayed there on Monday night, September 26th. On Tuesday, September 27th, Pierce delivered to Davis the four hundred head of cattle that were in the Pierce Pasture, and Davis, with his assistants, drove them to Alta Vista, where the cattle were loaded into cars on the Rock Island railroad, and Davis started with them, going as far as Herrington. There Grant G. Gillett met the train and took the cattle by a branch road to Woodbine, Davis going in another direction for other cattle. The cattle reached Woodbine early on the morning of Wednesday, September 28th, and were there unloaded. On the evening of the same day, Grant G. Gillett took three hundred and sixty-two head of the same cattle to Woodbine, loaded them on cars, and shipped them to St. Joseph, consigning three hundred and one head to the J. C. Bohart Commission company, and sixty-one head to Thomas Trowers Sons; Davis accompanying the cattle, and reaching St. Joseph on the morning of September 29th.

On Sunday, September 25, 1898, Grant G. Gillett caused one hundred and fifty of the cattle that remained on the Skiddy Ranch, to be driven to Woodbine. These cattle were mingled with other cattle (how many is not stated) then at that point, and, on the night of September 25th, they were shipped to the J. C. Bohart Commission Company, of St. Joseph, and arrived there on the morning of September 26th.

The plaintiffs claim that the defendant, Rankin, purchased seventy-four head of the cattle so taken from the Pierce Pasture, and covered by the mortgage securing the note held by the plaintiff, McPherson, from the Bohart Commission Company, and the first count of the

petition is to recover $3,000 in favor of McPherson against Rankin for said seventy-four head of cattle so purchased by Rankin, and afterwards sold by him. The plaintiffs further claim that Rankin was a member of the firm of Rankin, Travis & Co., and that he purchased for said firm eighty-eight head of said cattle, so taken from the Pierce Pasture, from the J. C. Bohart Commission Company, and the second count is to recover the value thereof in favor of Schmidt, the holder of the second note, secured by the same mortgage.

On the other hand, the defendant claims, that the one hundred and fifty head of cattle taken from the Skiddy Ranch, on the 25th of September, 1898, and that reached St. Joseph on the 26th of September, 1898, were the inferior class of cattle of the whole bunch, or "tail enders," as they were called, and were mostly yearlings, whereas, the cattle that were in the Pierce Pasture were what were called "tops," that is, were older, heavier and better cattle; that the former were worth only about $3.80 a hundred, while the latter were worth $4.25 to $4.50 a hundred; that the one hundred and fifty head of cattle from the Skiddy Ranch that reached St. Joseph on the 26th of September, were not sold at once, but that they remained in the pens of the Bohart Commission Company to themselves, and that on the 29th of September, David Rankin, the father of the defendant, was in St. Joseph and saw them in the pens, and they were offered for sale to him but that he declined to buy; that on that night David Rankin returned to his farm in Atchison county, and informed his son, the defendant, of those cattle; and that on the next day the defendant and Travis, and a man named Murchie, went to St. Joseph, the 30th of September, and purchased the one hundred and fifty head, together with others, which had been brought from the Skiddy Ranch on the 25th of September, from the Bohart Commission company, paying $3.80 per hundred therefor.

The defendant further claims that they bought

none of the three hundred and sixty-two head of cattle that were brought from the Pierce Pasture to St. Joseph, on the 29th of September, but that they were older and better cattle, and were kept in a separate pen by the Bohart Commission·company. The defendant further claims, that the cattle purchased by him, for himself and his firm, were the inferior cattle that arrived in St. Joseph on the 26th of September, and that they were easily distinguishable from the cattle from the Pierce Pasture, which arrived there on the 29th of September, by reason of the facts, both of their being young and inferior, and because they were what is called "stale" cattle, that is, they had been in the pens several days, and had been fed on hay and then given water to drink, which had the effect of temporarily increasing their weight, and which treatment would show from the hair of the cattle standing out straight instead of lying down smoothly, as would the hair of fresh cattle that had only recently come into the stock yards.

Much oral testimony was adduced on each side, intended to identify the cattle purchased by the defendant, as the cattle which came from the Skiddy Ranch, as the defendant claims, or as the cattle which came from the Pierce Pasture, as the plaintiffs claim. Each party attempted to trace each bunch of cattle from the time it left the Skiddy Ranch, or the Pierce Pasture, until the sale thereof in St. Joseph, and the plaintiffs introduced testimony tending to show that the defendant sold some of the cattle purchased by him on September 30, 1898, in Chicago, and some of them in Buffalo, New York, in February, 1899.

The plaintiffs introduced in evidence the account sales of cattle, on account of Grant G. Gillett, by the Bohart Commission Company on October 1, 1898, and October 3, 1898. The account sales both showed that the cattle were sold on account of Grant G. Gillett. The account sales of October 1, 1898, showed that the cattle sold were branded

S-T; that there were three hundred and three of such cattle sold on that day, ranging in price from $3.60 to $3.65 per hundred, and that of the three hundred and three, the defendant bought two hundred and one, and his friend, Murchie, bought thirty-six. The account sales of October 3, 1898, show the sale of two hundred and eighty-five head. No brands are given in the account sales. They sold at prices ranging from $3.50 per hundred to $4.40 per hundred, but neither Rankin nor Murchie appear to have purchased any of those. Only one hundred and forty-one of the two hundred and eighty-five brought $4.20 to $4.40; the balance ranging from $3.50 to $3.95 in price.

Further facts appearing in the evidence will be noted in the course of the opinion, the foregoing being sufficient to indicate the issues of fact involved.

The court gave eight instructions at the request of the plaintiffs, and twelve at the request of the defendant. The plaintiffs claim that the second, third, sixth and ninth instructions given for the defendant are erroneous, and that the sixth instruction given for the defendant is in conflict with the first instruction given for the plaintiffs.

Those instructions referred to are as follows:

Instruction numbered one given for the plaintiff is: "The court instructs the jury that, although you may find from the evidence and under the other instructions given you, that Grant G. Gillett sold the S-T cattle in the Pierce Pasture in the summer of 1898, to Chas. R. Hollinger, nevertheless if you further find from the evidence that prior to the 20th day of August, 1898, said Hollinger had given said Gillett authority to take control of said cattle and dispose of them as he chose, upon procuring for him (said Hollinger) a certain price per head over and above the mortgage that he (Hollinger) had put upon said cattle, and that on or before the 20th day of August, 1898, said Gillett had concluded himself to become the purchaser and owner of said cat-

tle and to pay to said Hollinger the price per head which he was to receive under the agreement as aforesaid, and that on said 20th day of August, 1898, he executed the chattel mortgage to Elmore & Cooper in evidence in this case, and within a few days thereafter, and while said cattle remained in the place described in the mortgage in Geary county, Kansas, said Gillett paid off the mortgage which Hollinger had placed upon said cattle, obtaining a release of the same, and sent said Hollinger a check for the amount per head which Hollinger had stipulated as aforesaid that he should receive, and that said Hollinger received said money, and acquiesced thereafter in the transaction when he learned that Gillett had himself assumed ownership of and mortgaged said cattle, then in that event, Gillett had authority to make the mortgage on said cattle on the 20th day of August, 1898, and when his title was afterwards completed by the completion of the payment for said cattle as aforesaid, his mortgagees had under their mortgage a good and complete mortgage lien upon said cattle, the mortgage taken having been filed for record in accordance with the provisions of the laws of the State of Kansas.''

The instructions given for the defendant, and here assigned as error, were as follows:

''2. Even if the jury should believe from the evidence that some of the cattle bought by defendant W. F. Rankin or by Rankin, Travis & Co., as shown by the evidence, were a part of the cattle covered and included in the mortgage read in evidence, yet if the jury cannot determine from the evidence how many, if any, of said cattle so bought by defendant or by Rankin, Travis & Co. were included in said mortgage, the plaintiffs cannot recover on either count of the petition.

''3. The court instructs the jury that in order for plaintiffs to recover they must prove by a preponderance of the evidence the following facts:

''First. That at the time of the bringing of this

action plaintiffs were the holders by assignment and transfer by the owners thereof, of the two notes mentioned in the evidence as being executed on August 20, 1898, by G. G. Gillett for six thousand dollars each, and of the chattel mortgage executed on said date by said Gillett purporting to secure said notes, and of the cause of action, if any, which the assignors of said notes had at the time of said transfer on account of the conversion alleged to have been made of cattle described in said mortgage.

"Second. That the cattle shipped by Gillett from Woodbine, Kansas, on September 28, 1898, to Bohart Commission Company were the same cattle conveyed in said chattel mortgage and that said cattle were of the description in said mortgage and were branded S-T on the left side, and that no other cattle than those included in said mortgage were included in said shipment.

"Third. That the defendant W. F. Rankin, purchased on the 30th day of September, 1898, and received into his possession, cattle from said shipment and which were conveyed in said mortgage.

"Without the existence of all said facts and of proof thereof plaintiffs cannot recover, and the defendant Rankin can be held liable only for such cattle as he received at the time which were included in said shipment and which were covered by said mortgage, and the burden of proof is upon the plaintiffs to show the number and description of all such cattle, if any, that said Rankin received out of said shipment.

"6. If the jury believe from the evidence that on August 20, 1898, one C. R. Hollinger was the owner of the cattle in controversy and made no sale of said cattle at or prior to said date to G. G. Gillett, plaintiff cannot recover in this action; and even if you should believe from the evidence that said Hollinger employed said Gillett as his agent to handle said cattle for him, this of itself would not constitute a sale of said

cattle to Gilett, nor would it give to said Gillett the right or authority to mortgage said cattle.

"9. The fact that some of the cattle bought by defendant, W. F. Rankin, on September 30, 1898, were branded S-T on the side, as shown by the evidence, is not alone sufficient to prove that said cattle so branded S-T were a part of the cattle included in the mortgage of plaintiffs' read in evidence, provided the jury believe from the evidence that cattle not included in said mortgage read in evidence were on the market at the St. Joseph Stock Yards on said September 30, 1898, and were also so branded S-T, and that some of said other cattle so branded S-T, if they were so branded, and not included in said mortgage, were bought by defendant Rankin of defendant Bohart Commission Company."

The defendant further claims that the trial court should have given a peremptory instruction for the defendant, and, therefore, the verdict and judgment are for the right party, and the judgment should be affirmed even if erroneous instructions were given by the court.

## I.

The principal contention of the defendant is that the court should have given a peremptory instruction to find for the defendant, and that, therefore, any erroneous instructions given for the defendant should not operate to reverse the judgment.

The gist of this contention is that the testimony of both the plaintiff and the defendant shows beyond question that the cattle purchased by the defendant on the 30th of September, 1898, were not a part of the cattle covered by the mortgage held by the plaintiff. In other words, that the cattle purchased by the defendant were a part of the one hundred and fifty cattle that came from the Skiddy Ranch, and reached St. Joseph on the 26th of September; that they were small, inferior cattle, yearlings, "tail enders," and not as

good cattle as the "tops" that were in the Pierce Pasture; that the cattle purchased by the defendant had remained in the pens of the Bohart Commission Company from the 26th of September to the 30th of September, and had become rough, hay-fed cattle, and were easily distinguishable from the Pierce Pasture cattle that had reached St. Joseph on the 29th of September.

The evidence discloses that all of the cattle were not branded S-T, but that some of them (the number is not stated) were branded OO, or "circles" as it is called.

It is conceded on both sides that originally there were one thousand head of cattle, owned by Joseph Gillett, and located on the Skiddy Ranch. He took four hundred of those, said to have been the pick of the lot, and placed them in the Pierce Pasture. Then he sold three hundred of said four hundred that were in the Pierce Pasture, and they were shipped to Missouri and sold, and cut no figure in this transaction. This left one hundred head in the Pierce Pasture, and six hundred head on the Skiddy Ranch. Then Joseph took three hundred of the six hundred on the Skiddy Ranch and placed them in the Pierce Pasture, with the one hundred that remained therein. This left four hundred in the Pierce Pasture and three hundred on the Skiddy Ranch. Joseph then sold the four hundred that were in the Pierce Pasture, and plaintiffs say, the two hundred and forty that remained on the Skiddy Ranch (according to the figures above given there were three hundred still on the Skiddy Ranch) to Hollinger. Hollinger authorized Grant G. Gillett to dispose of the four hundred in the Pierce Pasture, and the two hundred and forty or three hundred on the Skiddy Ranch, so as to net him two dollars a head, and in order to do so, Gillett borrowed $12,000 from Elmore & Cooper, on the 20th of August, 1898, and executed a mortgage on the four hundred head in the Pierce Pasture; and the plaintiffs are the assignees

of that mortgage and those notes. Grant Gillett, out of the proceeds of this loan, paid off the Hollinger mortgage to the Bohart Commission Company, and returned the same, with the note it secured, to Hollinger, and also paid Hollinger the two dollars a head he was to receive from the cattle.

It is conceded on both sides, that on the 25th of September, Grant G. Gillett shipped one hundred and fifty of the cattle that were on the Skiddy Ranch, to the Bohart Commission Company, in St. Joseph, and that they reached there on the 26th of September. It is also conceded that on the 27th of September Grant G. Gillett took the four hundred head that were in the Pierce Pasture to Woodbine, Kansas, and that on the 28th of September, he shipped three hundred and sixty-two of said four hundred head to St. Joseph, consigning three hundred and one thereof to the Bohart Commission Company, and they reached St. Joseph on the morning of the 29th of September. The plaintiffs claim that the one hundred and fifty head from the Skiddy Ranch that were shipped on the 25th of September, were mingled with other cattle—how many others were so added the plaintiffs' statement does not show. The defendant claims that the Skiddy Ranch cattle were kept in separate pens in St. Joseph from the Pierce Pasture cattle, and that the Skiddy Ranch cattle were sold on the 1st of October, whereas the Pierce Pasture cattle were not sold until the 3d of October.

The account sales of the 1st of October shows that there were three hundred and three head of cattle sold that day, and the account sales of October 3d shows that there were two hundred and eighty-five head sold that day, and that all of them were sold on account of Grant G. Gillett. Therefore, the story told by the account sales is that there were one hundred and fifty-three cattle sold on the 1st of October more than were embraced in the one hundred and fifty that were shipped from the Skiddy Ranch to St. Joseph on the 25th of Sep-

tember, and that there were sixteen less sold on the 3d of October than were shipped from the Pierce Pasture on the 28th of September and consigned to the Bohart Commission Company. The account sales of October 1st further shows that the defendant purchased two hundred and one of the Gillett cattle on that day, and that his friend Murchie purchased thirty-six cattle, aggregating two hundred and thirty-seven, or eighty-seven more cattle than the one hundred and fifty that were shipped from the Skiddy Ranch on the 25th of September. The one hundred and fifty from the Skiddy Ranch, shipped on the 25th of September, plus the three hundred and one shipped on the 28th of September, and all consigned by Grant Gillett to the Bohart Commission Company, aggregate four hundred and fifty-one head; yet the account sales of October 1st and 3d shows that four hundred and thirty-eight head altogether were sold on these two days.

These considerations clearly demonstrate that the defendant, alone, purchased fifty-one more cattle on the 30th of September, than were shipped from the Skiddy Ranch on the 25th of September. There is no evidence in the record that Gillett had any other cattle in the hands of the Bohart Commission Company between the 25th of September and the 3d of October, than the two shipments of September 25th and September 28th.

The account sales of October 1st further shows that the whole three hundred and three head sold that day were branded S-T, whereas the account sales of October 3d does not show what brands were on the cattle. The account sales of October 1st and 3d show that there were five hundred and eighty-eight cattle sold on those two days for Grant G. Gillett. If there were only one hundred and fifty S-T cattle shipped September 25th, and three hundred and one S-T cattle shipped September 28th, then there were in the hands of the Bohart Commission Company, on the 29th of September,

four hundred and fifty-one S-T cattle, and hence, there were one hundred and thirty-seven more cattle belonging to Gillett, in the hands of the Bohart Commission Company, and sold by them on October 1st and 3d than there were S-T cattle shipped from both the Skiddy Ranch and the Pierce Pasture; hence, if all the cattle that were sold on October 1st were S-T cattle, as shown by the account sales of that day, there must have been one hundred and fifty-three S-T cattle sold by the Bohart Commission Company on October 1st more than the one hundred and fifty that had come from the Skiddy Ranch, and as there is no evidence that any S-T cattle came from anywhere else except the Skiddy Ranch or the Pierce Pasture, the conclusion is inevitable that, if the account sales of October 1st is correct, there were one hundred and fifty-three of the cattle that came from the Pierce Pasture sold on that day, and the plaintiffs' mortgage covered all of the cattle that came from the Pierce Pasture, and consequently, on this showing, the plaintiff would be entitled to recover from the defendant, such of one hundred and fifty-three cattle as he purchased on that day, and it is conceded that he purchased in all two hundred and one S-T cattle on that day. And, therefore, if the defendant purchased all of the one hundred and fifty that came from the Skiddy Ranch, he would also have purchased fifty-one of the one hundred and fifty-three that were sold on that day that had come from the Pierce Pasture.

What is here said is not intended as decisive of the plaintiffs' right to recover for any particular number of cattle, but is cited to show that the testimony offered by the plaintiffs was sufficient to take the case to the jury, and that it was for the jury to determine how many of the cattle, purchased by defendant, were from the Skiddy Ranch and how many were from the Pierce Pasture. Therefore, there was no error in the refusal of the peremptory instruction asked.

## II.

The defendant contends that, even if he did purchase some of the cattle that came from the Pierce Pasture, still the plaintiffs cannot recover unless they furnish the jury accurate information as to how many of the Pierce cattle the defendant purchased, and that it was not competent to leave it to the jury to guess how many there were; and the second instruction given for the defendant told the jury that if they could not determine, from the evidence, how many of the cattle, purchased by the defendant, were included in the plaintiffs' mortgage, then the plaintiffs could not recover on either count of the petition.

The burden of proof was on the plaintiffs to show that the defendant had purchased some of the cattle covered by their mortgage, and the burden was further upon them to furnish the jury with evidence of facts from which the jury were authorized to draw inferences of fact, as to the exact number of cattle covered by the mortgage that the defendant had purchased.

The foregoing demonstration, in the first paragraph of this opinion, shows that the defendant must have purchased some of the cattle that came from the Pierce Pasture, for, he purchased, on that day, fifty-one more S-T cattle than had come from the Skiddy Ranch, and there is no evidence in the record that any S-T cattle came from anywhere except the Skiddy Ranch and the Pierce Pasture. Therefore, conceding to the defendant that he purchased the whole one hundred and fifty head that came from the Skiddy Ranch, and bearing in mind that the defendant purchased two hundred and one S-T cattle on the 1st of October, the jury would have been authorized, on such showing, to find that the defendant had purchased at least fifty-one of the cattle that came from the Pierce Pasture, and that were covered by the plaintiffs' mortgage.

The argument of the defendant is that all of the

Pierce Pasture cattle were sold on October 3, and that they were worth from $4.25 to $4.50 a hundred, whilst the cattle that were sold on October 1st were inferior cattle, and that defendant paid only $3.80 per hundred for them. As hereinbefore pointed out, however, there were only one hundred and forty-one of the two hundred and eighty-five cattle that were sold on the 3d of October that brought over $4 per hundred, the remaining one hundred and forty-four ranged in price from $3.50 to $3.95 per hundred. The argument of the defendant in this respect, therefore, is not supported by the account sales of October 3d; neither is the claim that the defendant paid $3.80 per hundred for the cattle purchased on the 30th of September, borne out by the account sales of October 1st, for according to those sales defendant paid $3.60 per hundred. This line of argument, therefore, does not overcome the fact that the defendant purchased at least fifty-one more S-T cattle, on the 30th of September, than were shipped from the Skiddy Ranch on the 25th of September. Instruction numbered 2, given for the defendant, was therefore erroneous, for there was evidence upon which the jury could have found that defendant had purchased at least fifty-one of the cattle covered by the mortgage, and the plaintiffs were, therefore, entitled to recover for that number of cattle even if the evidence left it so that the jury could not determine how many more the defendant purchased were covered by the mortgage. The court should have put the case to the jury for the jury to determine how many of the cattle the defendant purchased, which were covered by the mortgage, and to return a verdict for the plaintiff for the number so found to have been purchased.

The witness Barnes testified that the Bohart Commission Company sold to the defendant the cattle that had been there several days, and "possibly might have sold him some of the other cattle, I wouldn't be positive; more than likely he did." And the witness

Thompson, who was the general manager of the Bohart Commission Company, testified that of the cattle which arrived on September 26th, which included the one hundred and fifty from the Skiddy Ranch, ''We sold a few cattle along during the week, and receipts accummulated on us and we worked on the cattle along and sold a few more of them, and on Thursday, if I remember correctly, I went away and left some of the cattle unsold. Q. Where did you go to? A. Kansas City. Q. And some of the cattle that had been received here on Monday, the 26th, were still unsold? A. Yes, sir.'' The witness further testified that he tried to sell them to Mr. Rankin's father, and that he had gone to Kansas City to try to sell the cattle, and that they were sold during his absence. The jury were entitled, therefore, to consider this testimony in determining whether or not all of the one hundred and fifty cattle, that had come from the Skiddy Ranch, were on hand on the 29th of September, when the defendant's father saw the cattle, or on Friday, the 30th of September, when the defendant purchased. For if this testimony was true, then the defendant must have purchased more than fifty-one of the cattle covered by the plaintiffs' mortgage in order to make up the two hundred and one head, which he purchased on the 30th of September. In other words, there was evidence from which the jury could have found, as a fact, that the defendant had purchased a definite number of cattle that were covered by the plaintiffs' mortgage.

### III.

The sixth instruction given for the defendant is assigned as error. That instruction is as follows:

''If the jury believe from the evidence that on August 20, 1898, one C. R. Hollinger was the owner of the cattle in controversy and made no sale of said cattle at or prior to said date to G. G. Gillett, plaintiffs

193 Sup—18

cannot recover in this action; and even if you should believe from the evidence that said Hollinger employed said Gillett as his agent to handle said cattle for him, this of itself would not constitute a sale of said cattle to Gillett, nor would it give to said Gillett the right or authority to mortgage said cattle.''

It is claimed that this instruction is not only erroneous in itself, but that it is in direct conflict with instruction numbered 1 given for the plaintiff, which told the jury in substance that if Hollinger had given Gillett authority to dispose of the cattle, as he chose, upon procuring a certain price per head, over and above the mortgage, then on the cattle, made by Hollinger, and if Gillett himself concluded to become the purchaser and owner of the property, and to pay Hollinger the price per head which he was to receive under this agreement, and if Gillett executed the mortgage to Elmore & Cooper, and paid off the mortgage which Hollinger had placed upon the cattle, and obtained a release of the same, and sent Hollinger a check for the amount per head which Hollinger was to receive; and if Hollinger received the money and acquiesced thereafter in the transaction when he learned that Gillett had himself assumed the ownership of and mortgaged the cattle, then Gillett had the authority to mortgage the cattle, and his title was afterwards completed by the payment of the Hollinger mortgage and the amount he paid to Hollinger.

The defendant does not seriously contend that this instruction numbered 6 is not in conflict with plaintiffs' instruction numbered 1, but he contends that plaintiffs' instruction numbered 1 is erroneous, because he says the evidence shows that Hollinger gave Gillett power to sell the cattle so that it would net him (Hollinger) $1.50 to $2 per head over and above the mortgage he (Hollinger) had given to the Bohart Commission Company, but that Hollinger never gave Gillett any authority to mortgage the cattle and with the proceeds of the

mortgage to pay off the Hollinger mortgage to the Bo-
hart Commission Company, and the amount to be paid
to Hollinger; and furthermore that the evidence does
not show that Hollinger, when he received the $2 per
head, knew that Gillett had mortgaged the cattle instead
of selling them, and that he, therefore, never ratified the
unauthorized act of Gillett. And it is claimed that this
case falls within the rule laid down by this court in New
England Nat. Bank v. Northwestern Nat. Bank, 171 Mo.
307. It is true that at the time Gillett executed the
mortgage, under which the plaintiffs claim, and when
he paid off the Hollinger mortgage to the Bohart Com-
mission Company, and when he sent Hollinger the $2
per head he was to have, Hollinger did not know that
Gillett had mortgaged the cattle to Elmore & Cooper,
or that with the proceeds of that mortgage his mort-
gage to the Bohart Commission Company had been
paid, and the $2 per head to him had been paid. But
Hollinger afterwards ascertained all of those facts, and
knew them before the trial of this case, and perhaps be-
fore the institution of this suit, and when he did ascer-
tain all of the facts, he acquiesced in the act of Gillett,
and that acquiescence thereby made the act of Gillett, in
becoming the owner of the cattle himself, in that way,
a legal act, even if there could have been any objection
to Gillett becoming the purchaser himself, in the first
place. This case is unlike the case of New England Nat-
ional Bank v. Northwestern National Bank, supra, in
this, that in that case there were no cattle *in esse*, such
as were secured by the mortgage, whereas, in this case,
the cattle covered by the mortgage were not only *in esse*
but segregated from all the other cattle of similar kind
or brand. The Gillett mortgage was not void, but only
voidable at the election of Hollinger, and Hollinger is
not the complaining party here. Hollinger bought the
four hundred cattle in the Pierce Pasture, and the two
hundred and forty or three hundred head on the Skiddy
Ranch, from Joseph Gillett, by executing a mortgage

on those that were in the Pierce Pasture to the Bohart Commission Company, and paying Joseph with the proceeds of that mortgage. Grant Gillett bought the cattle from Hollinger by executing a mortgage on the four hundred head in the Pierce Pasture to Elmore & Cooper (he did not include in the mortgage the cattle that were on the Skiddy Ranch), and with the proceeds of that mortgage he paid Hollinger's mortgage to the Bohart Commission Company, and the $2 a head he had agreed to pay Hollinger, or that he had agreed Hollinger should receive over and above the mortgage. Elmore & Cooper sold the notes secured by the mortgage to the two banks mentioned, and those banks sold the notes to the plaintiffs, before maturity. Therefore, in its final analysis, the money of these plaintiffs paid for not only the four hundred cattle that were in the Pierce Pasture but also the cattle that were on the Skiddy Ranch, and also the $2 per head that went to Hollinger. The plaintiffs' security covered only the cattle that were in the Pierce Pasture. The mortgage securing the plaintiffs' money was properly recorded in the county of the residence of the mortgagor in Kansas. The cattle covered by the mortgage were, at the time of its execution, branded with a certain mark and segregated from all other cattle of any kind or brand. The plaintiffs, therefore, had whatever security is afforded by the cattle mortgage.

The defendant, however, contends that he purchased the cattle in open market, and paid full value therefor without any notice of the rights of the plaintiffs, and that the plaintiffs have no one but themselves to blame for the confusion and loss which ensued, arising from the fact that there were also other cattle marked S-T, not covered by the plaintiffs' mortgage, as well as the cattle of that brand which were so covered, and that the plaintiffs could have saved the loss and confusion if, after they had received the mortgage, or after their assignors had received it, they had caused

the cattle to be further branded with some other mark besides S-T, in order to definitely mark them.

It would undoubtedly have been the part of wisdom for the plaintiffs, or their assignors, so to have done. But defendant cites no case or law which imposed such a duty on the plaintiffs, or their assignors, nor does the defendant attempt to show that the plaintiffs, or their assignors, knew that there were any other cattle in the world branded S-T except those covered by the mortgage. At best, cattle mortgages afford uncertain security, and the conditions here presented are liable to arise at any time when the mortgagor is not thoroughly honest; for the facilities afforded to the mortgagor of spiriting away the mortgaged cattle are so great that loss to purchasers in the open market is liable to occur at any time. But the doctrine of *caveat emptor* applies to purchasers in open market. As between the plaintiffs holding a valid mortgage on the cattle in the Pierce Pasture, and the defendant, who purchased the cattle in the open market and without knowledge of the existence of the mortgage other than is imputed by the recording of the mortgage, both may justly be said to be innocent parties, but the rule of law is that a person who purchases in open market purchases at his own risk and peril, and is liable to the true owner of the property purchased if the seller and ostensible owner is not the true owner. Therefore, the rights of the parties in this action must be determined according to the cold principles of law. If the defendant purchased any of the cattle covered by the mortgage, he is liable to the plaintiffs for as many as he so purchased, and the fact that he paid full value for them in open market is no defense. The question of whether the cattle purchased by the defendant were or were not a part of the cattle covered by the mortgage, was a question of fact to be found by the jury. The jury found the fact for the defendant, and if the jury had been properly instructed, that would have

ended the case, but the plaintiffs were entitled to have the jury instructed according to the true law of the case, and if the law was improperly given to the jury, then the finding of the jury of the fact under such instruction, amounts to nothing. As hereinbefore pointed out, the second and sixth instructions given for the defendant were erroneous. The ninth instruction was also misleading, and should not have been given in the form it now is.

The case, therefore, in a nut shell is this: The plaintiffs claim that the defendant purchased a portion of the three hundred and one head of cattle that were covered by their mortgage and that arrived in St. Joseph on the 29th of September; whereas, the defendant claims that he purchased none of the three hundred and one that were covered by the mortgage, but that he only purchased one hundred and fifty that were not covered by the mortgage. If the defendant purchased any of the cattle that were covered by the mortgage, then he is liable to the plaintiffs for as many thereof as he so purchased, for as to them the plaintiffs had the better title. On the other hand, if the defendant purchased only the one hundred and fifty that were not covered by the mortgage, he got a good title, because as to them, the plaintiffs had no claim under their mortgage. The matter, therefore, is principally a question of fact for the jury to pass on, under proper instructions from the court as to the rights of the parties.

From the foregoing reasons it follows that the judgement of the circuit court must be reversed and the cause remanded for trial anew in accordance herewith.

All concur.