## BARNARD *v.* KELLOGG.

A wool broker in Boston sent to a dealer in wool at Hartford samples of foreign wool in bales which he had for sale, on commission, with the prices, and the latter offered to purchase the different lots at the prices, if equal to the samples furnished. The wool-broker accepted the offer, provided the wool dealer in Hartford would come to Boston and examine the wool on a day named, and then report if he would take it. The wool dealer went to Boston, and after examining certain of the bales as fully as he desired, and being offered an opportunity to examine all the remaining bales and to have them opened for his inspection, (which

---

* Baker *v.* Braman, 6 Hill, 48.
† Hartshorn, Executor, *v.* Day, 19 Howard, 223.
‡ Emerson *v.* Slater, 22 Howard, 41.

offer he declined) purchased. The wool proved, the vendor knowing nothing of it, to have been deceitfully packed, rotten and damaged wool and tags being concealed by an outer covering of fleeces in their ordinary state. On action brought to recover damages, *held*—

1. That the sale was not one by sample: and there having been no express warranty that the bales not examined should correspond with those which were, nor any circumstances from which the law could imply such a warranty, that the rule of *caveat emptor* applied.

2. That proof could not be received to control the said rule, that by the custom of merchants and dealers in wool in bales at Boston and New York, the two principal markets of the country for foreign wool, there is an implied warranty of the seller to the purchaser that the same is not falsely or deceitfully packed; especially where the parties did not know of the custom.

3. The office of a custom or usage in trade is to ascertain and explain the meaning and intention of the parties to a contract, whether written or in parol, which could not be done without the aid of this extrinsic evidence. It does not go beyond this, and is used as a mode of interpretation on the theory that the parties knew of its existence and contracted with reference to it.

ERROR to the Circuit Court for the District of Connecticut, the case being this:

In the summer of 1864, Barnard, a commission merchant residing in Boston, Massachusetts, placed a lot of foreign wool, received from a shipper in Buenos Ayres, and on which he had made advances, in the hands of Bond & Co., wool brokers in Boston, to sell, with instructions not to sell unless the purchaser came to Boston and examined the wool for himself. These brokers sent to E. N. Kellogg & Co., merchants and dealers in wool, in Hartford, Connecticut, at their request, samples of the different lots of wool, and communicated the prices at which each lot could be obtained. Kellogg & Co., in reply, offered to take the wool, all round, at fifty cents a pound, if equal to the samples furnished, and Bond & Co., for their principal, on Saturday, the 6th day of August, by letter and telegram, accepted this offer, provided Kellogg & Co. examined the wool on the succeeding Monday and reported on that day whether or not they would take it. Kellogg & Co. acceded to this condition, and the senior member of the firm repaired to Boston on the day

named and examined four bales in the broker's office as fully as he desired, and was offered an opportunity to ex-, amine all the bales, and have them opened for his inspection. This he declined to do, and concluded the purchase on the joint account of all the plaintiffs. Some months after this, on opening the bales it was ascertained that a portion of them were falsely and deceitfully packed, by placing in the interior rotten and damaged wool and tags, which were concealed by an outer covering of fleeces in their ordinary state. This condition of things had been unknown to Barnard, who had acted in good faith. It was, however, communicated to him, and he was asked to indemnify the purchaser against the loss he sustained in consequence of it. This he declined to do, and the purchaser brought this suit. The declaration counted:

1st. Upon a sale by sample.

2d. Upon a promise, express or implied, that the bales should not be falsely packed.

3d. Upon a promise, express or implied, that the wool inside of the bales should not differ from the samples by reason of false packing.

The court below, trying the cause without the intervention of a jury, held that there was no express warranty that the bales not examined should correspond to those exhibited at the brokers' store, and that the law under the circumstances could not imply any. But the court found as matters of fact, that the examination of the interior of the bulk of bales of wool generally, put up like these, is not customary in the trade; and though possible, would be very inconvenient, attended with great labor and delay, and for these reasons was impracticable; and that by the custom of merchants and dealers in foreign wool in bales in Boston and New York, the principal markets of this country where such wool is sold, there is an implied warranty of the seller to the purchaser that the same is not falsely or deceitfully packed, and the court held as a matter of law, that the custom was valid and binding on the parties to this contract, and gave judgment for the purchaser.

Argument in support of the custom.

This writ of error was taken to test the correctness of this ruling.

*Mr. N. Shipman, in support of it:*

1. While it is true, to a limited extent, that courts will not recognize customs directly contrary to a well-settled rule of law, yet courts are continually, and of necessity, upholding customs not in conformity with the common law. Indeed, as Lord Kenyon says, it is of the very essence of a custom that it should vary from the common law.*

Neither can there be a precise and definite rule established as to the admission of customs. Each custom must stand or fall by itself. If the custom and the common law can both exist, and the custom does not entirely abrogate the law, and is proved by strong testimony, then the custom stands and the common law yields.

Indeed, within its proper sphere, that is to say not destroying the common law, but modifying it in accordance with the suggestions of practical experience, courts regard usage as entitled to the highest consideration. Baldwin, J., in *Wilcocks* v. *Phillips*,† says:

"Its influence is universal. It attaches to nations and individuals. It creates obligations. It interprets laws. General custom is a general law, and forms the law of contracts, and this sometimes, though it be at variance with their terms. It controls even the principles of law. Thus the right to the way-going crops, days of grace, and time of protest, are regulated by the usage of the place or bank, and affect even those who have no notice of the custom. The ancient, established, uniform, and known custom of persons engaged in any trade, makes a law for that trade, though it is not applicable to other trades. It is their way of doing business. It is the rule to which all who enter that trade, are understood to consent. It makes, supplies, and regulates their contracts. Known and settled usage ought to be respected by courts and juries, unless such usages are against the law or policy of the country, otherwise our deal-

---

* Horton *v.* Beckman, 6 Term, 764.        † 1 Wallace, Jr., 63.

ings with foreigners in foreign lands will fall into disorder and confusion."

2. The custom of warranty against false packing of wool in bales, is not contrary to the rule of *caveat emptor*, but is based upon, and is a part of a well-known and established exception to the rule; for when there is no opportunity to inspect the commodity, the maxim *caveat emptor* does not. apply.\* Now the interior of wool in bales is in fact as much concealed from the buyer as if the bale was in the hold of a vessel on the ocean. The court below finds that the inspection of the interior of the bale is "impracticable." As matter of fact it is known that foreign wool or cotton comes into market packed in bales of about one thousand pounds each, secured by iron hoops, and having been subjected to very great pressure. From the nature of the commodity, the difficulty and expense of opening the bales, the lack of machinery with which to repack them, the delay and labor incident to an attempt to examine the interior of the bulk, a personal inspection of the contents of each bale and of each fleece is impossible. Fraudulent packing is thus rendered easy and difficult of detection. Pecuniary redress for the fraud is impracticable unless there is a general rule of warranty extending from the consumer to the original packer or grower. For it would be well-nigh impossible for each successive person through whose hands the goods passed, from the parties in South America to the manufacturer in the United States, to take a special warranty against false packing. A general and universal rule prevents fraud, and renders the rights and liabilities of all parties certain and easy of enforcement. Courts have therefore been constrained to decide that on every sale of cotton or wool in bales, there is an implied warranty, that substances foreign to the article sold were not concealed in the interior of the package.†

---

\* Gardiner v. Gray, 4 Campbell, 144; Hyatt v. Boyle, 5 Gill & Johnson, 110.

† Oneida Manufacturing Co. v. Lawrence, 4 Cowen, 444; Beebee v. Robert, 12 Wendell, 413; Boorman v. Johnson, Ib. 566; Gallagher v. Waring, 9 Wendell, 20; Manufacturing Co. v. Dixon, 3 Cushing, 407.

3. The customs, contravening the rule of *caveat emptor*, which have been disregarded by the courts, are of a different nature from the one now under consideration. The former were customs whereby the seller impliedly warranted his wares to be " merchantable," and were thus directly at variance with the common law. This custom is not a warranty in regard to character or quality, but is in effect a warranty against fraud; that " material foreign to, and not properly belonging to or with" the article sold has not been secretly placed within the bale.

*Mr. Charles E. Perkins, contra.*

Mr. Justice DAVIS delivered the opinion of the court.

No principle of the common law has been better established, or more often affirmed, both in this country and in England, than that in sales of personal property, in the absence of express warranty, where the buyer has an opportunity to inspect the commodity, and the seller is guilty of no fraud, and is neither the manufacturer nor grower of the article he sells, the maxim of *caveat emptor* applies. Such a rule, requiring the purchaser to take care of his own interests, has been found best adapted to the wants of trade in the business transactions of life. And there is no hardship in it, because if the purchaser distrusts his judgment he can require of the seller a warranty that the quality or condition of the goods he desires to buy corresponds with the sample exhibited. If he is satisfied without a warranty, and can inspect and declines to do it, he takes upon himself the risk that the article is merchantable. And he cannot relieve himself and charge the seller on the ground that the examination will occupy time, and is attended with labor and inconvenience. If it is practicable, no matter how inconvenient, the rule applies. One of the main reasons why the rule does not apply in the case of a sale by sample, is because there is no opportunity for a personal examination of the bulk of the commodity which the sample is shown to represent. Of such universal acceptance is the doctrine of *caveat*

*emptor* in this country, that the courts of all the States in the Union where the common law prevails, with one exception (South Carolina), sanction it.

Applying this acknowledged rule of law to this case, it is easy to settle the rights of the parties, and to interpret the contract which they made. That the wool was not sold by sample clearly appears. And it is equally clear that both sides understood that the buyer, if he bought, was to be his own judge of the quality of the article he purchased. Barnard expressly stipulated, as a condition of sale, that Kellogg should examine the wool, and he did examine it for himself. If Kellogg intended to rely on the samples as a basis of purchase, why did he go to Boston and inspect the bales at all, after notice that such inspection was necessary before the sale could be completed? His conduct is wholly inconsistent with the theory of a sale by sample. If he wanted to secure himself against possible loss, he should either have required a warranty or taken the trouble of inspecting fully all the bales. Not doing this, he cannot turn round and charge the seller with the consequences of his own negligence. Barnard acted in good faith, and did not know or have reason to believe that the wool was falsely packed. The sale on his part was intended to be upon the usual examination of the article, and the proceeding by Kellogg shows that he so understood it, and it is hard to see what ground of complaint even he has against Barnard. It will not do to say that it was inconvenient to examine all the bales, because if inconvenient it was still practicable, and that is all, as we have seen, that the law requires. The case of *Salisbury* v. *Stainer*, reported in 19th Wendell,* is similar in its facts to this case, and the court applied to it the rule of *caveat emptor*. There bales of hemp were sold which turned out to be falsely packed. The purchaser wished to treat the sale as a sale by sample; but the court said to him, "You were told to examine for yourself, and having opened one bale, and at liberty to open all, and omitting to do it, you cannot be per-

---

* Page 158.

mitted to allege that the sale was a sale by sample, nor to recover damages as on an implied warranty." It is, therefore, clear by the general principles of law, adopted in the interests of trade and commerce, that the seller in this instance was not answerable over for any latent defects in the bales of wool.

But the learned court below having found that by the custom of dealers in wool in New York and Boston there is a warranty by the seller implied from the fact of sale, that the wool is not falsely packed, and having held Barnard bound by it, the inquiry arises whether such a custom can be admitted to control the general rules of law in relation to the sale of personal property.

It is to be regretted that the decisions of the courts, defining what local usages may or may not do, have not been uniform. In some judicial tribunals there has been a disposition to narrow the limits of this species of evidence, in others to extend them, and on this account mainly the conflict in decision arises. But if it is hard to reconcile all the cases, it may be safely said they do not differ so much in principle, as in the application of the rules of law. The proper office of a custom or usage in trade is to ascertain and explain the meaning and intention of the parties to a contract, whether written or in parol, which could not be done without the aid of this extrinsic evidence. It does not go beyond this, and is used as a mode of interpretation on the theory that the parties knew of its existence, and contracted with reference to it. It is often employed to explain words or phrases in a contract of doubtful signification, or which may be understood in different senses, according to the subject-matter to which they are applied. But if it be inconsistent with the contract, or expressly or by necessary implication contradicts it, it cannot be received in evidence to affect it.* Usage, says Lord Lyndhurst, "may be admissible to explain what is doubtful; it is never admissible

* See Notes to Wigglesworth *v.* Dallison, 1 Smith's Leading Cases, 498; 2 Parsons on Contracts, § 9, 535; Taylor on Evidence, 943, and following.

to contradict what is plain."* And it is well settled that usage cannot be allowed to subvert the settled rules of law.† Whatever tends to unsettle the law, and make it different in the different communities into which the state is divided, leads to mischievous consequences, embarrasses trade, and is against public policy. If, therefore, on a given state of facts, the rights and liabilities of the parties to a contract are fixed by the general principles of the common law, they cannot be changed by any local custom of the place where the contract was made. In this case the common law did not, on the admitted facts, imply a warranty of the good quality of the wool, and no custom in the sale of this article can be admitted to imply one. A contrary doctrine, says the court, in *Thompson* v. *Ashton*,‡ " would be extremely pernicious in its consequences, and render vague and uncertain all the rules of law on the sales of chattels."

In Massachusetts, where this contract was made, the more recent decisions on the subject are against the validity of the custom set up in this case. In *Dickinson* v. *Gay*,§ which was a sale of cases of satinets made by samples, there were in both the samples and the goods a latent defect not discoverable by inspection, nor until the goods were printed, so that they were unmerchantable. It was contended that by custom there was in such a case a warranty implied from the sale that the goods were merchantable. But the court, after a full review of all the authorities, decided that the custom that a warranty was implied, when by law it was not implied, was contrary to the rule of the common law on the subject, and therefore void. If anything, the case of *Dodd* v. *Farlow*,‖ is more conclusive on the point. There forty bales of goat skins were sold by a broker, who put into the memorandum of sale, without authority, the words " to be of merchantable quality and in good order."

It was contended that by custom, in all sales of such skins, there was an implied warranty that they were of merchant-

---

* Blackett *v.* Royal Exchange Assu. Co., 2 Crompton & Jervis, 249.
† See Note to 1st Smith's Leading Cases, *supra*.
‡ 14 Johnson, 317.        § 7 Allen, 29.        ‖ 11 Allen, 426.

able quality, and, therefore, the broker was authorized to insert the words, but the court held the custom itself invalid. They say, "It contravenes the principle, which has been sanctioned and adopted by this court, upon full and deliberate consideration, that no usage will be held legal or binding on parties, which not only relates to and regulates a particular course or mode of dealing, but which also engrafts on a contract of sale a stipulation or obligation which is inconsistent with the rule of the common law on the subject." It is clear, therefore, that in Massachusetts, where the wool was sold and the seller lived, the usage in question would not have been sanctioned.

In New York there are some cases which would seem to have adopted a contrary view, but the earlier and later cases agree with the Massachusetts decisions. The question in *Frith* v. *Barker\** was, whether a custom was valid that freight must be paid on goods lost by peril of the sea, and Chief Justice Kent, in deciding that the custom was invalid, says: "Though usage is often resorted to for explanation of commercial instruments, it never is, or ought to be, received to contradict a settled rule of commercial law." In *Woodruff* v. *Merchants' Bank,*† a usage in the city of New York, that days of grace were not allowed on a certain description of commercial paper, was held to be illegal. Nelson, chief justice, on giving the opinion of that court, says: "The effect of the proof of usage in this case, if sanctioned, would be to overturn the whole law on the subject of bills of exchange in the city of New York;" and adds, "if the usage prevails there, as testified to, it cannot be allowed to control the settled and acknowledged law of the State in respect to this description of paper." And, in *Beirne* v. *Dord,*‡ the evidence of a custom that in the sale of blankets in bales, where there was no express warranty, the seller impliedly warranted them all equal to a sample shown, was held inadmissible, because contrary to the settled rule of law on the subject of chattels. But the latest authority in that

---

\* 2 Johnson, 327.            † 25 Wendell, 673.            ‡ 1 Selden, 95.

State on the subject, is the case of *Simmons* v. *Law.** That was an action to recover the value of a quantity of gold-dust shipped by Simmons from San Francisco to New York on Law's line of steamers, which was not delivered. An attempt was made to limit the liability of the common carrier beyond the terms of the contract in the bill of lading by proof of the usage of the trade, which was well known to the shipper, but the evidence was rejected. The court, in commenting on the question, say : " A clear, certain, and distinct contract is not subject to modification by proof of usage. Such a contract disposes of all customs by its own terms, and by its terms alone is the conduct of the parties to be regulated, and their liability to be determined."

In Pennsylvania this subject has been much discussed, and not always with the same result. At an early day the Supreme Court of the State allowed evidence of usage, that in the city of Philadelphia the seller of cotton warranted against latent defects, though there were neither fraud on his part or actual warranty.† Chief Justice Gibson, at the time, dissented from the doctrine, and the same court, in later cases, has disapproved of it,‡ and now hold that a usage, to be admissible, " must not conflict with the settled rules of law, nor go to defeat the essential terms of the contract."

It would unnecessarily lengthen this opinion to review any further the American authorities on this subject. It is enough to say, as a general thing, that they are in harmony with the decisions already noticed. See the American note to *Wigglesworth* v. *Dallison,* 1 Smith's Leading Cases, where the cases are collected and distinctions noticed.

The necessity for discussing this rule of evidence has often occurred in the highest courts of England on account of the great extent and variety of local usages which prevail in that country, but it would serve no useful purpose to review the cases. They are collected in the very accurate English note

* 3 Keys, 219.                    † Snowden *v.* Warder, 3 Rawle, 101.
‡ Coxe *v.* Heisley, 19 Pennsylvania State, 243 ; Wetherill *v.* Neillson, 20 Id. 448.

to *Wigglesworth* v. *Dallison*, and are not different in principle from the general current of the American cases. If any of the cases are in apparent conflict, it is not on account of any difference in opinion as to the rules of law which are applicable.

These rules, says Chief Justice Wilde, in *Spartali* v. *Benecke*,\* " are well settled, and the difficulty that has arisen respecting them, has been in their application to the varied circumstances of the numerous cases in which the discussion of them has been involved." But this difficulty does not exist in applying these rules to the circumstances of this case. It is apparent, that the usage in question was inconsistent with the contract which the parties chose to make for themselves, and contrary to the wise rule of law governing the sales of personal property. It introduced a new element into their contract, and added to it a warranty, which the law did not raise, nor the parties intend it to contain. The parties negotiated on the basis of *caveat emptor*, and contracted accordingly. This they had the right to do, and by the terms of the contract the law placed on the buyer the risk of the purchase, and relieved the seller from liability for latent defects. But this usage of trade steps in and seeks to change the position of the parties, and to impose on the seller a burden which the law said, on making his contract, he should not carry. By this means a new contract is made for the parties, and their rights and liabilities under the law essentially altered. This, as we have seen, cannot be done. If the doctrine of *caveat emptor* can be changed by a special usage of trade, in the manner proposed by the custom of dealers of wool in Boston, it is easy to see it can be changed in other particulars, and in this way the whole doctrine frittered away.

It is proper to add, in concluding this opinion, that the conduct of the parties shows clearly that they did not know of this custom, and could not therefore have dealt with reference to it.

---

\* 10 Common Bench, 222.

JUDGMENT REVERSED, and the cause remanded with directions to award a

VENIRE DE NOVO.

BRADLEY and STRONG, JJ., dissented.