In re NATHAN.

Appeal of HAGAR.

(Circuit Court of Appeals, Second Circuit. November 11, 1912.)

No. 47.

1. BANKRUPTCY (§ 339*)—FINDINGS OF REFEREE—SALES—DELIVERY.

A finding that the goods delivered under a contract of sale constituted "a good delivery" was a sufficient finding on an issue that the seller had waived its right to a prompt return of unmerchantable goods.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 525, 526; Dec. Dig. § 339.*]

2. BANKRUPTCY (§ 340*)—CLAIMS FOR GOODS SOLD—MERCHANTABLE QUALITY—EVIDENCE—FINDINGS.

Evidence *held* to sustain a referee's finding that goods delivered under a contract of sale were merchantable and of the character purchased.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 527; Dec. Dig. § 340.*]

3 SALES (§ 73*)—"SALE BY SAMPLE."

A "sale by sample" is not accomplished whenever a specimen of the thing under consideration is exhibited to the buyer or discussed during the progress of negotiations; but there must be a definite intention on the part of both buyer and seller that a definite article shall be the standard to which every delivery must conform.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 188; Dec. Dig. § 73.*

For other definitions, see Words and Phrases, vol. 7, pp. 6307, 6308.]

4. SALES (§ 288*)—MERCHANTABLE QUALITY—INSPECTION.

Where a bankrupt contracted to purchase cheap underwear from a claimant according to particular description, and with notice that the goods must necessarily be made from cheaper material than had been used in similar goods previously sold to him, because of a rise in the price of cotton, the bankrupt's receipt and retention of deliveries under the contract without any inspection or examination for weeks, and in some instances months, after their receipt, operated as a waiver of his right to return the goods for unmerchantableness.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 817–823; Dec. Dig. § 288.*]

Appeal from the District Court of the United States for the Southern District of New York; Charles M. Hough, Judge.

In the matter of bankruptcy proceedings of Alexander Nathan. From an order denying a petition to re-examine and expunge a proof of claim filed by the Canasawacta Knitting Company, the trustee appeals. Affirmed.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Rosenberg & Levis, of New York City (Robert P. Levis and James N. Rosenberg, both of New York City, of counsel), for appellant.

Lyon & Smith, of New York City (Edward P. Lyon, of New York City, of counsel), for respondent.

Before LACOMBE, COXE, and WARD, Circuit Judges.

LACOMBE, Circuit Judge. A voluntary petition was filed by Nathan in September, 1908. In the spring or early summer of 1907 he made a contract with the Canasawacta Knitting Company for the delivery of a number of cases of cheap cotton underwear (to retail at 25 cents a garment), to be manufactured by the company and shipped to him during the coming season. He subsequently increased his order, and received in all 1,047 cases. He paid in full on October 5, 1907, for 831 cases, and the claim filed by the company is for a balance due on the remaining cases, $7,553.95. The trustee in bankruptcy filed a petition for re-examination of the claim on the ground that there was a counterclaim against the company because the goods were not in accord with samples delivered to Nathan at the time of making the contract, were unmerchantable and defective, and that the bankrupt had suffered damages because of a breach of warranty in excess of $20,000. Testimony was taken before a referee, who found that the sale was not by sample, but in effect a sale by description, and that the goods were, on the whole, a proper delivery. He allowed the claim.

[1] Upon a review in the District Court the referee was sustained in his finding that the sale was not by sample, but the judge held that he had improperly excluded some testimony, to the effect that the vendor had waived its right to a prompt return of the goods. There was some testimony as to the unmerchantability of some of the goods, and the District Judge was of the opinion that the referee had made no finding on that branch of the case. This was a mistake, since the referee had found that there was "a good delivery" under the contract. Nathan had sold all of the cases, except 42, and the District Court sent the cause back to the referee, with "directions to allow as an offset to the claim of the Knitting Company the contract value of all unmerchantable goods not disposed of by Nathan." When the matter came before the referee on the rehearing, the trustee adduced no evidence as to the unmerchantability of any of the goods contained in the 42 cases. Thereupon the referee found that there was no offset to be made to the claim, and allowed it in full. Upon review the District Court, without further opinion, sustained the referee, and from its order to that effect this appeal is taken.

[2] We have examined the voluminous record, with its greatly conflicting testimony. It is unnecessary to discuss it at any length, but we may briefly indicate the circumstances which lead us to the conclusion we have reached. The company made similar goods for Nathan the year before, which he found satisfactory. By the time when the contract for 1907 was made, the price of cotton yarn had greatly advanced. In order to make goods which could be sold at retail at

25 cents, it was necessary to use yarn of a lower grade, to make goods of a lighter weight and to cheapen the finishing, at least of the drawers. The testimony as to the interviews preceding the making of the contract leaves no doubt in our minds that Nathan was informed that this inferior yarn would have to be used in the goods.

[3] Referring to the bankrupt's assertion that the sale was by sample, Judge Hough said:

"A technical sale by sample is not accomplished whenever a specimen of the thing under consideration is exhibited or discussed during the progress of negotiation. There must be a definite intention on the part of both vendor and vendee that a definite article shall be the standard to which every delivery shall conform, and it is certainly not asking too much of any one who alleges such an unusual and strict warranty to produce the standard for inspection. The very fact that the standard sample cannot be produced is ground of suspicion; for, when a man's rights depend upon a particular piece of cloth (for instance), the fact that he did not keep that piece of cloth with sedulous care is ground for belief that it was not so important when the contract was made as the contracting party would wish the court to believe."

We have no doubt that Nathan was told that an inferior material would be used in making both garments (the shirts and the drawers), that they would weigh less, that the standard for shirts would be this inferior material made up generally as the last year's output was, that, for drawers, this inferior material (which they could not show him, because they had not yet decided just what it would be) would also be used, and that they would be finished like some drawers they showed him, without inside band, or suspender tape, with two buttons only, and single, instead of double, seated. We do not believe they gave him any samples, except subsequently, when they began to make the goods, and then sent many samples (like the goods) for him to use with his customers.

There was evidence adduced upon the first hearing before the referee tending to show that many of the garments were defective; but we do not find this persuasive to a conclusion that they were unmerchantable. They were of the cheapest class of underwear in the market, and were not intended or expected to have the perfection of higher grade goods. Nathan was told that his goods would be lighter in weight than other goods made by the same mill to be sold by it to jobbers. He disposed of all the goods except 42 cases, and although he testified that many of the goods he sold were thrown back by his customers, it must be remembered that this was during the panic of 1907, when any excuse, however trivial, was availed of to avoid acceptance of goods, which embarrassed traders had agreed to buy. Moreover, we do not know on what representations Nathan sold to his own customers. He may have said the goods would be substantially like those of the year before, although he had himself been distinctly told they would not be, on account of the rise in the price of cotton yarn. Moreover, the trustee had full opportunity on the rehearing to supplement any weakness in the prior testimony by more persuasive proof. The 42 cases which remained unsold were, as Nathan himself testified, not selected by him as poor goods, but were "just the ordinary run." If

these had all been examined, and it had been demonstrated that so large a proportion of the contents was defective as to make them unmerchantable, the trustee might reasonably contend that the whole 1,047 cases were in the same condition when received, and might here argue that the District Court erred in confining the counterclaim for imperfections to the 42 cases. This he failed to do, and we see no error in the referee's finding that there was a good delivery under the contract.

[4] It appeared that Nathan received these goods, and held them without any inspection or examination, for weeks, and in some instances months, after their receipt. The District Court held that this was not such an acceptance as would destroy a counterclaim for breach of warranty, express or implied, because "none of these defects could have been discovered without an unpacking of the goods and inspection, garment by garment." We do not find the excuse sufficient. Nathan could tell whether the weight was less than he insists that it should have been, and apparently all of the goods were lighter than such weight, without disturbing a single garment. Two or three boxes taken at random out of each case could be thoroughly examined for the other alleged defects. If these goods were what the bankrupt asserts they were, such an examination, conducted when each lot was delivered, would have disclosed that fact. The representative of the company urged Nathan, when the very first shipment was received, to make an examination to see if everything was all right; but he refused to do so, and sent the shipment into warehouse, where it remained for weeks, while other shipments were coming in and being similarly disposed of without examination.

We are of the opinion that the manufacturer's implied warranty of merchantability did not survive the acceptance of the goods. But we do not place affirmance upon that ground, because there is some evidence as to conversations with a representative of the knitting company, which the District Judge held amounted to a waiver of the right to insist on a return of goods, alleged to be unmerchantable, promptly after delivery and opportunity to examine. Instead of discussing that testimony, and the questions of law arising as to the power of the particular representative (Frey) to bind the company to such a waiver, it seems better to decide, as we do, that the proof does not show that there was a breach of the implied warranty that the goods would be merchantable—a conclusion which was reached by the referee and expressed in his finding that "there was a good delivery of the goods contracted for."

The order is affirmed.