## CUDAHY PACKING CO. v. NARZISEN-FELD.

(Circuit Court of Appeals, Second Circuit. November 10, 1924.)

No. 48.

**1. Courts ⬯359—Law of state in which contract made and performed governs decision of federal courts.**

The law of the state in which a sale contract was made and performed governs decision of federal court as to whether there was implied warranty.

**2. Sales ⬯270—Buyer who examined eggs held not entitled to rely on any implied warranty as to quality or fitness.**

In view of Personal Property Law, N. Y. § 96, providing that, where buyer has examined the goods, there is no implied warranty as regards defects which such examination ought to have disclosed, where buyer of eggs made such examination as he desired before making contract there was no implied warranty as to their quality or fitness.

**3. Sales ⬯41—Maxim of "caveat emptor" applicable to sales of personalty, where buyer has opportunity of inspection and seller is guilty of no fraud.**

The maxim of "caveat emptor" is based on the principle that the purchaser buys at his own risk, unless the seller gives an express warranty, or unless the law implies a warranty from the circumstances or the nature of the thing sold, or unless the seller be guilty of fraudulent misrepresentation or concealment in a material inducement to the sale, and it applies to sales of personalty where the buyer

has an opportunity to inspect and the seller is guilty of no fraud.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Caveat Emptor.]

**4. Sales ⬯73—"Sale by sample" defined.**

To constitute a "sale by sample" it must have been the understanding of both parties that the goods exhibited constituted the standard with which the goods not exhibited corresponded and to which deliveries would conform, and where buyer of eggs examined such of the eggs as he desired there was no sale by sample.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Sale by Sample.]

**5. Sales ⬯271—In sale by sample seller selects sample and necessarily warrants that quality of merchandise conforms to same.**

In a sale by sample the seller selects the sample, knows or is presumed to know the condition of the goods offered, and necessarily warrants that it corresponds to the remainder of the goods not exhibited.

**6. Sales ⬯355(3)—Purchaser pleading sale by sample and inferiority of merchandise cannot prevail where evidence shows sale was not by sample.**

In seller's action for purchase price of merchandise, defendant *held* bound by pleading alleging sale by sample and that quality of merchandise was inferior to sample, and where uncontradicted evidence showed no sale by sample his defense failed.

**7. Sales ⬯176(4)—Buyer offered opportunity of inspection cannot show that inspection was impracticable, where he did not exact a warranty of quality and fitness.**

That it was impracticable for buyer given opportunity for inspection to examine all eggs of quantity sold, because of time required, *held* not to prevent application of rule of caveat emptor, since purchaser should have insisted on a warranty if complete inspection was inconvenient.

**8. Customs and usages ⬯18—Evidence not admissible unless custom or usage specially pleaded.**

Evidence as to trade custom not specially pleaded is not admissible under the general issue or general denial.

**9. Appeal and error ⬯232(2)—Objection to testimony not made at trial cannot be considered on appeal to justify its exclusion.**

Where plaintiff's objection to admission of evidence of trade custom and usage was not grounded on defendant's failure to specially plead such custom or usage, such ground is not available on appeal to support its exclusion.

**10. Customs and usages ⬯8—Evidence of custom or usage inadmissible to change established rule of law.**

Evidence of custom or usage of place where contract was made will not be allowed to subvert an established rule of law.

**11. Customs and usages ⊖⟶8—Evidence of custom or usage held not admissible to vary established rule of law.**

Personal Property Law N. Y. § 152, providing that implied obligations may be negatived or varied by custom of the locality, *held* not to authorize proof of custom or usage to vary the rule of law, established by section 96, that no warranty is implied where buyer has examined goods offered for sale.

In Error to the District Court of the United States for the Southern District of New York.

Action by Jacob Narzisenfeld against the Cudahy Packing Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Jacob Narzisenfeld, the defendant in error, was plaintiff below and will be hereinafter called plaintiff. The Cudahy Packing Company, plaintiff in error, was defendant below and will be hereinafter called defendant.

The plaintiff is a wholesale dealer in butter and eggs, and as such is in business in the city of New York. The defendant is a corporation organized under the laws of the state of Maine but has an office in the city of New York, where it was engaged in purchasing and selling eggs at wholesale.

The complaint alleges that on September 24, 1920, the plaintiff sold and delivered to defendant at the latter's special instance and request 400 cases of eggs, at an agreed price of $6,300, plus cartage amounting to $98, or a total of $6,398; that although duly demanded no part of this sum had been paid, although it was due and owing to the plaintiff.

In its answer the defendant admitted that plaintiff had offered to sell to defendant 400 cases of eggs for $6,398, which sum included cartage. It declared that at the time of the offer the eggs were in a warehouse in New York City and that the plaintiff exhibited to defendant 10 cases from the said 400 cases as samples, which samples were of good quality, in good condition, and not mouldy, and that it represented that the quality and condition of all the 400 cases were the same as the samples.

The answer further alleged that defendant thereupon and within a reasonable time notified the plaintiff of the condition of the eggs as aforesaid, and that it refused to accept them, whereupon defendant, as the eggs were perishable and rapidly deteriorating in quality and value, notified plaintiff that it would sell said eggs in the open market for the best price that could be obtained

therefor; that defendant so sold the eggs and received and realized therefor the sum of $2,663.26, which sum defendant offered and tendered plaintiff, who neglected and refused "to accept the same, which said sum defendant tenders herewith."

The defendant counterclaimed and alleged that because of the breach of the contract and the warranty it was damaged in the sum of $3,734.74.

The court below, at the end of the trial, directed a verdict for plaintiff in the sum of $7,657.32.

Gilbert H. Montague, of New York City (Gilbert H. Montague, Joseph W. Goodwin, and Charles Furnald Smith, all of New York City, of counsel), for plaintiff in error.

Hartman & Levy, of New York City (Hugo Levy, of New York City, of counsel), for defendant in error.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). This action was brought to recover the amount it is claimed the defendant agreed to pay to plaintiff for 400 cases of eggs sold and delivered by the latter to the former in New York City in September, 1920. The eggs at the time of the sale were in a warehouse in the city of New York.

It appears that the defendant's representative called at the plaintiff's place of business in New York and inquired whether he had a carload of eggs for sale. A carload usually consists of 400 cases. The plaintiff replied that he had several carloads of very good eggs. The defendant's representative asked whether the eggs had been inspected by the Mercantile Exchange, and he was informed that they had been, and he was handed a number of inspection certificates which he looked over. He finally selected one and asked for an order authorizing him to go to the National Storage Warehouse in Brooklyn, where the eggs were in cold storage, and examine the carload of eggs described in the certificate which he had selected. This order was issued to him, and on the following day a representative of the defendant went to the warehouse and made the inspection. He was called as a witness by the defendant and testified as follows:

"Q. Now, tell us what you did after you arrived at the National Storage Warehouse? A. I presented in the office of the National Cold Storage the order I had from Mr. Nar-

zisenfeld, allowing us to inspect two lots of eggs that were stored in his name.

"Q. And what did you do then? A. And they asked me how many cases of eggs I wanted and I told them to get 10 out of each lot, and I waited until the cases were brought down from an upper floor. * * *

"Q. After you had made this request that 10 cases be brought down, were they brought to you? A. Twenty cases were brought down.

"Q. Twenty cases were brought down? A. Yes.

"Q. Did they tell you that there were 10 each from each lot? A. They told me there were 10 cases out of each lot, yes. * * *

"Q. Just describe what you did in inspecting those 20 cases of eggs? A. I proceeded to take one case off of each truck at a time, and put it on the scale and weighed the case to see how much each weighed, and to make a note of the weight, and after the weighing of them, to open them up and put them on the bench in the candling department they have there, and we make our inspections that way. * * *

"Q. Did you inspect by taking off the covers of each case? A. Yes, take the cover right off.

"Q. Just tell how the eggs are packed as you take off a cover? A. There are 30 dozen in a case.

"Q. Is there any cardboard container? A. Yes, each container holds three dozen eggs. You take the cover off, and there is a cushion on the top, or what we call a flat, with excelsior in some cases, and you take that off, and the eggs are packed 3 dozen to each filler.

"Q. How many fillers are there? A. Five on each side. * * *

"Q. And you took off the top layer? A. Yes.

"Q. And how many eggs in each case did you inspect? A. Half a case inspection; 15 dozen.

"Q. Thirty dozen being in the entire case? A. Yes, sir.

"Q. How long did it take you to inspect in that fashion those 20 cases? A. Well, I should say it would take about 15 or 20 minutes to go through each side, after the case was opened up. * * *

"Q. Then, how do you proceed according to custom? A. You proceed to open up the eggs and candle them before the light. If the sample proves satisfactory, that is all you look at. If it does not come up to your expectations, you call for another 5 or 10 cases. * * *

"Q. As far as your order was concerned, there was no limit upon the number of cases you could examine? A. I have no recollection whether it said 10 cases or a lot of eggs.

"Q. But you remember, and you have so testified, that the storage people asked you how many cases you wanted? A. Yes.

"Q. So that would indicate to your mind that there was no limit on the number, so far as your order was concerned, is not that correct? A. Yes.

"Q. Yes. Then, they brought down, as you had ordered, 10 cases, is that right? A. That is right."

After this inspection had been made to the satisfaction of the defendant's representative, he went to the plaintiff's place of business and stated that he would buy the carload he had inspected, being lot No. 5892, and that the eggs were to be shipped to the defendant's branch in Philadelphia at the agreed price, f. o. b. warehouse. There is no dispute as to what the price was.

No claim is made that the plaintiff expressly warranted the eggs, either by express contract or by representation. If warranty there was, it must have been an implied one. And on the facts as they appear in this record it is impossible to hold that a warranty of quality can be implied. The early cases make it clear that the original rule was that in the absence of knowledge by the seller that the article which he sold was of bad quality he was not liable on an implied warranty. But if the seller, if he were a dealer, knew that the goods were not merchantable, he was liable. Rolle's Abr. 90, pl. 1, 2, 3, 4. In other cases the rule of caveat emptor applied. What modifications have been ingrafted upon the law since the early decisions were made it is not now important to inquire.

It is sufficient for the purpose of this case that at the time this contract of sale was made the buyer had made an actual inspection of the eggs which he purchased.

In Williston on Contracts, vol. 2, p. 1859, it is said that, "where inspection is had or may be had, the tendency in the United States seems to be to hold that at least, in the absence of guilty knowledge on the part of the seller, the inspection precludes the existence of any implied warranty, regardless of whether the defect is latent. In some cases, however, reliance is placed on the fact that inspection would reveal the defect."

[1] But whatever may be the tendency of judicial decisions in this country either in the federal or in the state courts, we must decide this case according to the law of the

state of New York where the contract of sale was made and where it was performed.

The Personal Property Law of New York (Consol. Laws, c. 41) § 96, subd. 3, declares as follows:

"If the buyer has examined the goods, there is no implied warranty as regards defects which such examination ought to have revealed."

Section 96 of the Personal Property Law took effect on September 1, 1911, and was in force when the contract now before the court was made. And the New York Court of Appeals in Rinaldi v. Mohican, 225 N. Y. 70, 73, 121 N. E. 471, 472, held "that section 96, expressed as it is in general terms, applies to all sales, including sales of food, and that any rules hitherto applied inconsistent with this section are abolished." In Race v. Krum, 222 N. Y. 410, 118 N. E. 853, L. R. A. 1918F, 1172, that court had held in an opinion, in which all the judges had concurred, that accompanying all sales by a retail dealer of articles of food for immediate use there is an implied warranty that the same is fit for human consumption. This, the court declared, "was an exception to the general rule regarding the sale of other chattels based on grounds of public policy." But in Rinaldi v. Mohican Co., supra, the court after referring to the Personal Property Law already cited said:

"In a sale of food, therefore, there is no longer an implied warranty of fitness unless the buyer expressly or by implication acquaints the seller with the purpose of the purchase and unless it appears that the buyer relies on the seller's skill or judgment. Even then if the buyer has examined the goods and should have discovered the defect there is no warranty. The burden of showing that he has made known his purpose and that he has relied upon the seller is on him who claims the existence of an implied warranty. If either of these two facts do not appear he fails in his claim."

[2] In the case at bar there is certainly no evidence that the buyer relied on the seller's skill or judgment. Moreover, the buyer had examined the eggs and should have discovered their defective condition. The defendant did not rely upon the seller's judgment but upon its own inspection.

The case is not unlike that of Bokenfohr Co. v. Gross, 177 App. Div. 768, 164 N. Y. S. 887. In that case the court said:

"It is clear from the pleadings and the evidence that Coyle bought these goods as the agent of defendants and accepted delivery of them in New Orleans. It was a sale of existing and specific goods, made after inspection by defendants' agent, Coyle. The title, therefore, passed at once to the defendants. Brigg v. Hilton, 99 N. Y. 517–529, 3 N. E. 51, 52 Am. Rep. 63. It is not a case where the vendee relied upon the judgment of the vendor. There was therefore no warranty as to the condition of the goods. Hight v. Bacon, 126 Mass. 10, 30 Am. Rep. 639. Coyle, as agent for the defendants, dealt with the plaintiff on equal terms, so far as the quality and condition of the goods were concerned. It is a case where the rule of caveat emptor applies, and there was no warranty, express or implied. Therefore the evidence as to the condition of the garlic on the dock at New York after a sea voyage, as well as the expert evidence to the effect that the bad condition as shown on arrival was the result of defects existing at the time of the sale, was immaterial and inadmissible."

[3] The maxim of caveat emptor embodies an ancient rule of the common law. It is based on the principle that the purchaser buys at his own risk unless the seller gives an express warranty, or unless the law implies a warranty from the circumstances of the case or the nature of the thing sold, or unless the seller be guilty of fraudulent misrepresentation or concealment in a material inducement to the sale. Under it the buyer is put upon his guard and must stand the loss of an imprudent purchase unless the soundness of the thing bought is warranted by the seller. It applies to sales of personalty where the buyer has an opportunity to inspect the goods and the seller is guilty of no fraud. Barnard v. Kellogg, 10 Wall. 383, 388, 19 L. Ed. 987; Simmons Creek Coal Co. v. Doran, 142 U. S. 417, 12 S. Ct. 239, 35 L. Ed. 1063; Moore v. Sawyer (C. C.) 167 F. 826, 843; Tilley v. Bridges, 105 Ill. 336, 339; Northern Supply Co. v. Wangard, 117 Wis. 624, 94 N. W. 785, 98 Am. St. Rep. 963; Oil Well Supply Co. v. Watson, 168 Ind. 603, 80 N. E. 157, 15 L. R. A. (N. S.) 868; Schmidt v. Rankin, 193 Mo. 254, 91 S. W. 78; Wissler v. Craig's Adm'r, 80 Va. 22, 32; Hargous v. Stone, 5 N. Y. 73, 82. In Slaughter's Adm'r v. Gerson, 13 Wall. 379, 385 (20 L. Ed. 627), the court, speaking of the doctrine of caveat emptor, said:

" * * * Where the means of information are at hand and equally open to both parties, and no concealment is made or attempted, the language of the cases is, that the misrepresentation furnishes no ground for a court of equity to refuse to enforce

the contract of the parties. The neglect of the purchaser to avail himself, in all such cases, of the means of information, whether attributable to his indolence or credulity, takes from him all just claim for relief."

We think the doctrine of caveat emptor governs this case as opportunity was accorded to the buyer to inspect the eggs as fully as he desired, and an inspection was actually made by it not of cases selected by the seller but of those selected by the buyer's representative.

[4] In the case of a contract to sell or a sale by sample we may concede that there is an implied warranty that the bulk shall correspond with the sample in quality. We may also concede that if the seller is a dealer in goods of the kind sold there is an implied warranty that the goods shall be free from any defect which renders them unmerchantable and which a reasonable examination of the sample would not disclose. But the difficulty in the case now before the court is that the sale which was made cannot be regarded as a sale by sample when a small quantity of the goods then in existence in bulk is exhibited as a specimen of a larger quantity called the bulk which is not present for examination. A sale by sample is not accomplished, as this court pointed out in the case of In re Nathan, 200 F. 379, 381, 118 C. C. A. 531, whenever a specimen of the thing under consideration is exhibited to the buyer in the course of the negotiations. It must have the understanding of both parties that the goods exhibited constituted the standard with which the goods not exhibited corresponded and to which deliveries would conform.

If the vendor affords the vendee opportunity of inspection, as was done in this case, and the vendee inspects a portion of the goods which he calls for and fails to examine the remainder which he is given the opportunity to inspect, he cannot claim in the absence of an express agreement to that effect, that what he did examine constituted a "sample" to which the remainder, which he might have examined, was warranted to conform.

[5] In a sale by sample the seller selects the sample. He knows or is presumed to know the condition of the goods he is proposing to sell. And if the goods are not present so that the buyer can inspect them the seller is allowed, for the convenience of the trade, to select a sample and offer it as a specimen of the remainder. He knows the condition and quality of his own property, and he may select a fair sample and use it

as a standard, and in doing so he necessarily warrants that it corresponds to the remainder of the goods which are not exhibited. The Monte Allegre, 9 Wheat. 616, 644, 6 L. Ed. 174; Reynolds v. Palmer (C. C.) 21 F. 433, 435; Selser v. Roberts, 105 Pa. 242, 245.

The defendant in its answer alleged a sale by sample. It declared that the plaintiff offered to sell the eggs mentioned and "exhibited to defendant 10 cases from said 400 cases as samples of said eggs, which samples were of good quality, in good condition and not mouldy and plaintiff thereupon represented that the quality and condition of all of said 400 cases of eggs were the same as said samples."

[6] The defendant is bound by its pleading. The evidence in the record fails to show a sale by sample. That alone is sufficient to defeat the defendant and we might rest this case right here.

The goods sold consisted of articles of food and in the early law the obligation of warranty appears to have been more extensive than was the case in the sale of other articles. But it is now thought to be doubtful that there is any broader warranty in the case of food than of other goods unless the seller is a dealer and the buyer bought for immediate consumption. See Williston on Contracts, vol. 2, § 996. And it has been held that the maxim "caveat emptor" applies in the sale of provisions by one dealer to another dealer in the course of commercial transactions, and that there is no implied warranty or representation of quality or fitness. Nelson v. Armour Packing Co., 76 Ark. 352, 90 S. W. 288, 6 Ann. Cas. 237; Howard v. Emerson, 110 Mass. 320, 14 Am. Rep. 608; Giroux v. Stedman, 145 Mass. 439, 14 N. E. 538, 1 Am. St. Rep. 472.

[7] The trial court excluded evidence that it was impracticable to examine all the eggs in the carload of 400 eggs prior to placing the order and this has been assigned as error. The evidence, however, was in our opinion inadmissible. The defendant's representative inspected only half of the eggs in each of the 10 cases, and spent 3 or 3½ hours in so doing. At this rate it would have taken a very considerable amount of time had an inspection been made of all the cases. We were told at the argument that it would have taken 20 days of 7 hours each to have examined the whole 400 cases. In Barnard v. Kellogg, 10 Wall. 383, 389, 19 L. Ed. 987, which involved a purchase of bales of foreign wool, the buyer inspected only four of the bales, although he

was offered the right to inspect all of them. "If he wanted to secure himself against possible loss, he should either have required a warranty or taken the trouble of inspecting fully all the bales. Not doing this, he cannot turn round and charge the seller with the consequences of his own negligence. * * * It will not do to say that it was inconvenient to examine all the bales, because if inconvenient it was still practicable, and that is all, as we have seen, that the law requires." The rule of caveat emptor was applied. That rule governs this case. If the purchaser when given the opportunity to examine all the cases did not avail itself of it except to a limited extent, it might have insisted on a warranty for its protection. But no such warranty was asked or given.

[8, 9] It is said that the trial court erred in excluding evidence offered in behalf of defendant showing a custom in the wholesale egg trade in New York City for the buyer before purchasing to inspect only 10 cases out of a carload, to consider the seller as representing that the balance of the eggs are equal in quality to those inspected, and if, when examined within a reasonable time after delivery, all the eggs do not conform in quality to the 10 cases inspected, for the buyer to make an allowance for defective eggs or take back the shipment.

The exclusion of this evidence as to custom was not error.

Whenever a local usage or custom is relied upon to take a case out of a general rule of law, it has been held that the custom should be specially pleaded and cannot be shown under the general issue or general denial, 22 Encyc. Pl. & Pr. 407. But as the plaintiff did not at the trial base his objection to the admission of this evidence on the ground that it had not been pleaded, that ground is not available in this court. Renner v. Bank of Columbia, 9 Wheat. 594, 6 L. Ed. 166; Roberts v. Graham, 6 Wall. 578, 18 L. Ed. 791.

[10] This, however, happens to be not decisive as to the admissibility of the testimony offered; for, in our opinion, if the usage relied upon had been pleaded it would not have availed. It is well settled law that usage will not be allowed to subvert an established rule of law. To allow this to be done, as was said in Barnard v. Kellogg, 10 Wall. 383, 391, 19 L. Ed. 987, would lead to mischievous consequences, embarrass trade, and be against public policy. An established rule of law cannot be changed by any local custom of the place where the contract is made. Hearne v. New England Mutual Maine Ins. Co., 20 Wall. 488, 22 L. Ed. 395; National Savings Bank v. Ward, 100 U. S. 195, 25 L. Ed. 621; Grace v. American Central Insurance Co., 109 U. S. 278, 3 S. Ct. 201, 27 L. Ed. 932; The Gazelle, 128 U. S. 474, 9 S. Ct. 139, 39 L. Ed. 496; Hopper v. Sage, 112 N. Y. 530, 20 N. E. 350, 8 Am. St. Rep. 771; Atkinson v. Truesdell, 127 N. Y. 230, 27 N. E. 844; O'Donohue v. Leggett, 134 N. Y. 44, 31 N. E. 269.

[11] But it is said that the excluded evidence was admissible because of the Personal Property Law of New York, § 152, which reads as follows:

"*Variation of Implied Obligations.*— Where any right, duty or liability would arise under a contract to sell or a sale by implication of law, it may be negatived, or varied by express agreement or by the course of dealing between the parties, or by custom, if the custom be such as to bind both parties to the contract or the sale [Added by L. 1911, ch. 571]." Consolidated Laws of N. Y. vol. 5, p. 6267.

This section does not seem to us applicable. No custom can transcend the law and to give section 152 the meaning which we are asked to give it in this case is to make of no effect section 96, subd. 3, set forth in an earlier part of this opinion.

Judgment affirmed.