**GILLETTE et al. v. KELLING NUT CO.**
No. 6159.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 17, 1950.

Decided Nov. 8, 1950.

L. S. Parsons, Norfolk, Va. (Venable Parson, Kyle & Parsons, Norfolk, Va., and Thomas L. Woodward, Suffolk, Va., on the brief), for appellants.

Edward F. Howrey, Washington, D. C., and William C. Worthington, Norfolk, Va. (Sanders, Gravelle, Whitlock & Howrey, Washington, D. C., and James G. Martin & Son, Norfolk, Va., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

A civil action was brought by Edward F. Gillette (hereinafter referred to as Gillette) and Mabel Gillette, trading as Peanuts Growers Milling Company, against The Kelling Nut Company (hereinafter referred to as Kelling) in a Virginia State Court and was removed by Kelling to the United States District Court for the Eastern District of Virginia. This action was brought to recover damages in the sum of $4,500.00 said to have been occasioned by an alleged breach of warranty, given by Kelling to Gillette upon the sale of certain peanuts.

After the taking of Gillette's deposition and the filing of exhibits, both parties moved for summary judgment and these motions were orally argued. The District Court granted the motion of defendant-appellee and denied the motion of plaintiff-appellant. In entering judgment for Kelling, the District Judge stated: " * * * the peanuts were sold to plaintiffs (appellants) and purchased by them subject to the approval of a new inspection which was made by the Federal-State Inspector on September 7 and 8, 1948, and defendant (appellee) made no representations upon which plaintiffs relied * * * and that there is no gen- ·uine issue as to any material fact." Plaintiffs have duly appealed to us.

The only questions that we need consider are: (1) Was there a warranty by Kelling upon which Gillette relied; and (2) Was

there any genuine issue as to any material facts, which would preclude the summary judgment in favor of Kelling. Since we think the District Judge correctly answered both these questions in the negative, the judgment below must be affirmed.

On August 24, 1948, Gillette wrote to Johnson, Vice-President of Kelling, a letter which read in part: "I have a customer who is in need of some medium peanuts. * * * If you have any mediums or Extra large that you will sell me, please state quantity and quote your best price and state whether or not the price quoted carries 1% brokerage for me. If the peanuts offered are not U. S. grade, please show how much they are off."

Johnson's letter to Gillette, dated August 26, 1948, contained these two paragraphs:

"Sorry, we have no Mediums at all in excess of what we will need, but we can spare a car or two of Extra Large if we can get our price of 21¢ F.O.B. Suffolk cold storage. At this price we would be willing to pay the usual brokerage of 1%.

All of the peanuts in cold storage have undergone federal inspection and are U. S. grade even to count. It is true that Virginia Peanuts this past year were affected by too much moisture so that some of them might show a slight bleaching. We find that cars that went into cold storage with 8% and 9% moisture are now coming out and show in most cases 6% or less."

On September 4, 1948, Gillette wrote to Johnson: "These two cars of Extra Large Peanuts that we have been writing and talking about have been sold, *subject to the approval of the buyer of a new inspection.*" (Italics ours.)

Johnson immediately accepted these terms as the basis for the contract of sale and notified the American Cold Storage Company of Suffolk, Virginia, where the peanuts were held in storage, to permit Gillette to inspect the peanuts. J. P. Thomas, Federal-State Inspector, inspected the peanuts and duly executed two inspection certificates. One certificate concluded with the words: "Grade: Stock fails to grade U. S. Extra Large Virginia Shelled Peanuts account of percentage of Unshelled or damaged in excess of tolerance."

The second certificate contained the statement: "Grade: Stock fails to grade U. S. Extra Large Virginia Shelled Peanuts account of percentage of Foreign material in excess of tolerance."

The Planters Nut and Chocolate Company (hereinafter called Planters), Gillette's customer, also inspected the peanuts and made certain laboratory tests on samples of the peanuts. Thereupon Planters agreed to accept the peanuts and Kelling was so notified. Gillette paid the purchase price to Kelling. Upon the delivery of some of the peanuts to Planters, Planters rejected them. Gillette then took the peanuts back and demanded that Kelling refund the purchase price. When Kelling refused to do this, Gillette disposed of the peanuts and instituted this civil action against Kelling.

Gillette's case here is based on the legal theory of a sale by description of Extra Large Peanuts, with a warranty by Kelling that the peanuts were Extra Large peanuts, upon which Gillette relied, and that this warranty was breached by Kelling to the consequent damage to Gillette. We think the District Court correctly gave summary judgment against Gillette, on this theory, upon the facts clearly before us.

Had Kelling here, in response to Gillette's letter agreed to sell Gillette Extra Large peanuts and then had Kelling delivered to Gillette peanuts which did not answer this description, Gillette would unquestionably have had a case against Kelling. But Kelling's first letter (August 26, 1948) stated that it had on hand one or two cars of peanuts which federal inspectors had graded as U. S. grade, but that these particular peanuts had been in storage for some time and had probably suffered from bleaching and moisture. And Gillette had informed Kelling in Gillette's letter (August 24, 1948) that Gillette was buying the peanuts for the purpose of selling them to a customer.

Then came Gillette's letter to Kelling (September 4, 1948): "These two cars of Extra Large Peanuts that we have been

writing and talking about have been sold, subject to the approval of the buyer of a new inspection." This indicates quite clearly that neither Gillette nor Planters was interested in a mere sale by description, but that, on the contrary, Gillette wished to buy from Kelling, and Planters to buy from Gillette, two specific cars of peanuts, as to which Planters were to have a new inspection and an approval by Planters in the light of this inspection. Planters, in the light of the new inspection and the inspector's new certificates that the peanuts did not grade "U. S. Extra Large," and after Planters had made laboratory tests of samples from these particular peanuts, nevertheless agreed to accept them. And, on the strength of all this, the peanuts were delivered by Kelling, which received the purchase price from Gillette.

That Gillette bought the peanuts from Kelling, relying on the inspection and the approval of Planters and not on any warranty of Kelling, is further shown by two letters written by Gillette to Planters. Thus, in the letter of September 9, 1948, Gillette stated: "This will confirm, as of yesterday, when you approved the results of the Federal State grading and your inspection of samples taken by you two cars of Extra Large Va. Peanuts at 21-1/4¢. As agreed, you will take delivery of these peanuts at the American Cold Storage, this City, on Monday, September 13th. You may call for them any time to suit your convenience and that of the American Cold Storage, after 10 A.M."

Again, in the letter of September 28, 1948, written after Planters had rejected the peanuts, we find:

"Since you must have been familiar with the general bad condition of last year's crop of peanuts; and since your representative took a sample of these peanuts and had he not been able to go as deeply into the pile as he thought advisable, he could have reported this fact to you and you could have declined to buy the peanuts; and since the Federal-State Inspector took his sample and reported the results to you; and since the sample taken by your representative was processed by an employee of your own Company; and since you approved both the Inspector's report and laboratory report of your own sample; and since it was your acceptance on which I bought these peanuts, as I had never seen them at that time; then it is quite plain to me that you and your company were under every obligation to make every possible effort to use these peanuts. When you pay no more attention to my request for a reinspection and test sample than you have apparently paid to my request of the 23rd, then it does not seem that you are making even a reasonable effort to use the peanuts that you bought on your own sample.

"Now had I sampled the peanuts and delivered the sample to you and the peanuts had not come up to sample it would have been an entirely different matter. But since my action was based entirely on your acceptance, then I am still expecting you to comply with my reasonable request for reinspection and laboratory test of a new sample.

\* \* \* \* \* \*

"Your confirmation of September 3rd. of peanuts purchased, specified 'U. S. Grade, Subject Government inspection and also subject to our inspection and approval of quality and condition.'

"When you approved of both reports to me personally in your office on Sept. 8th, then I told you I would close with the seller and called you back for final confirmation. I then called Mr. C. E. Johnson from a near-by phone and then called you and closed the deal."

The fact that Gillette, with every opportunity for inspection, made no inspection of the peanuts, we think, lends further support to the conclusion we have reached.

We do not for a moment imply that there may not be a sale by description and a cumulative (rather than an exclusive) right of inspection and approval by the buyer, when the agreement of the parties and their conduct so indicate. But the facts of the instant case justify no such assumption. Gillette's letters and testimony indicated clearly that he was buying the peanuts in reliance, not upon the description of Kell-

ing, but upon the inspection of Planters. The sale was accordingly made by Kelling to Gillette, and Gillette paid Kelling on this understanding.

We quote two further extracts from Gillette's testimony:

"Q. * * * That was the answer, was it not, to the question I referred to in the previous Exhibit (Exhibit 1) when you asked: 'If the peanuts offered are not U. S. grade please show how much they are off?' A. I would say that is the answer, yes, sir. If he was going to be exactly correct about it, *it should be 'were' instead of 'are'; in other words, they were U.S. grade at the time of inspection."* (Emphasis added.)

\* \* \* \* \* \*

"They (Planters) were not willing to accept the several months' old inspection that had been made previously."

■ Nor do the cases and text-writers support Gillette's contention of a warranty. Thus, in Texas Star Flour Mills Co. v. Moore, C.C., 177 F. 744, 753, District Judge Philips said:

"The petition * * * counts upon the statement made in the first letter written by the defendants February 3, 1908, 'You know the quality of our red wheat,' etc. It would be sufficient of this to say that, as the plaintiff expressly declined to enter into any contract based thereon, it ought not now to fall back on that representation. * *

"I know of no recognized rule of law by which a statement made respecting the quality of an article offered for sale, where the offeree had declined to accept the proposal, can be carried forward and attached to a subsequent convention between the parties evidenced in writing which does not mention such former assurance as an integral part of the present agreement. The law, I think, is to the contrary."

See, also, Barnard v. Kellogg, 10 Wall 383, 19 L.Ed. 987; Moore v. Scott Stamp & Coin Co., 2 Cir., 178 F.2d 3; Cudahy Packing Co. v. Narzisenfeld, 2 Cir., 3 F.2d 567; Herman H. Hettler Lumber Co. v. Olds, 6 Cir., 221 F. 612, 615–616; Massie

v. Firmstone, 134 Va. 450, 462, 114 S.E 652; Johnson v. Hoffman, 130 Va. 335, 107 S.E. 645; Brooke v. Laurens Milling Co., 78 S.C. 200, 58 S.E. 806.

■■ In Williston on Sales, Vol. 1, § 234, it is stated: "* * * the tendency at Common Law in the United States seems to be to hold that, at least in the absence of guilty knowledge on the part of the seller, inspection or the opportunity for it precludes the existence of any implied warranty. * * * it seems best to revert to the fundamental test whether the buyer justifiably relied on the seller's skill and judgment. It is possible for a buyer who inspects and selects goods to base his determination to purchase entirely on his own real or supposed knowledge, and if this is the case the fact that defects are latent should not establish a warranty." See, also, Benjamin on Sales, § 610; Van Iderstine, Co. v. Barnet Leather Co., 242 N.Y. 425, 152 N.E. 250, 46 A.L.R. 864; Vold on Sales, §§ 144, 145, 150; Tiffany on Sales, §§ 77, 78; Waite on Sales, pp. 187-194; Burdick on Sales (3rd ed.) pp. 144–154; 15 Am. & Eng. Encyc. L. (2d ed.) 1236, 1237.

It is not without significance here that Kelling was neither a manufacturer nor a grower; both Kelling and Gillette were dealers in peanuts. See, Barnard v. Kellogg, 10 Wall. 383, 19 L.Ed. 987; Belcher v. Goff, 145 Va. 448, 134 S.E. 588; Baker v. Kamantowsky, 188 Mich. 569, 155 N.W. 430.

We find nothing in the cases cited in Gillette's briefs which would militate against the conclusion we have reached. See, Greenland Development Corporation v. Allied Heating Products Co., 184 Va. 588, 35 S.E.2d 801; Van Duyn v. Matthews, 181 Va. 256, 24 S.E.2d 442; Economic Water Heating Corporation v. Dillon Supply Co., 156 Va. 597, 159 S.E. 78; Procter v. Spratley, 78 Va. 254; Gerst v. Jones & Co., 32 Gratt., Va., 518, 521-522.

■ We find no merit in Gillette's contentions that here was a sale by sample and that the case involved general issues of facts which would preclude summary judgment for defendant. Incidentally, the

plaintiffs moved for summary judgment in their favor. We need not consider other questions involved in this case.

The judgment of the District Court is affirmed.

Affirmed.