Wright, J.,
delivered the opinion of the court:
Claimant is a commission merchant and entered into two several contracts with the defendant, one June 21, 1898, the other June 23, 1898, by the first of which he sold and undertook to deliver about 3,900 tons of coal to the Quartermaster’s Department of the United States Army at Honolulu, Hawaiian Islands, to be delivered at the wharf at the rate of not less than 100 tons per day, 2,240 pounds to the ton, the delivery under the first contract to commence -on the arrival of the British ship Euterpe at Honolulu, on or about July 23, 1898, for which defendant agreed to pay $9 per ton. By the second contract claimant sold and undertook to deliver at Honolulu, on wharf, as customary, at a rate not less than 100 tons per day, about 5,000 tons of coal, at 2,240 pounds to the ton, the delivery on the second contract to commence with a cargo of about 2,220 tons, to arrive about October 1,1898, to sail from Australia about twenty-five days after signing the contract, for which defendant agreed to pay $9 per ton. Prior to making the contracts, and as a preliminary step to their execution, claimant had submitted proposals in which the quantity subsequently specified on the first contract was segregated as about 1,600 tons, to be shipped on the Euterpe, and 2,300 tons upon another vessel; and in respect of the second contract to be shipped in a vessel with a capacity of about 2,200 tons, to sail from Newcastle within twenty-five days, and the residue to be shipped otherwise, and from these propositions the contracts were evolved, introducing into them the language of claimant’s propositions, “about 3,900 tons,” and “about5,000 tons,” respectively.
At the time the contracts for coal were made it was a custom . at San Francisco, where they were entered into, for shipowners to insert in their charter parties a stipulation to the effect *604 that cargoes were to be discharged in such customary berth or place as consignee shall direct, ship always being afloat, at an average specified number of tons per day, to commence when ship was ready to discharge and notice thereof had been given to the consignee. If the ship should be detained beyond the lay days so provided, a stipulated sum was to bo paid by the «shipper as demurrage. Such stipulations were inserted in the contract of shipping between the claimant and the shipowners he employed to transport the coal in question, but it does' not appear that the officers or agents of the defendant who made the contracts had knowledge or notice of such custom, nor that the contracts, or either of them, were made in view or contemplation of such custom.
The harbor at Honolulu was under the control of a harbor master at the time of the arrival of the several ships containing the coal designed for delivery to the defendant in conformity to the contracts in question, and all ships were assigned places at the wharf, in the order of their arrival, by such harbor master. Although defendant was notified of the arrival of the ships in the harbor, there was delay in reaching a wharf where the cargoes were to be discharged, but such delay was not the fault of the defendant, nor the consequence of negligence on its part, but resulted from the crowded condition of the harbor, the wharves then being occupied by vessels that had previously arrived, and assignments of claimant’s ships to a wharf were made by the harbor master as soon as room could be provided for them, in conformity to the usage of the port. After the arrival of some of the vessels at the wharf, the cargoes were not discharged as rapidly as the contracts required, but it does not appear defendant was at fault in this particular, but it does appear it had then the ability and was ready and willing to receive and dispose of the cargoes as rapidly as the ships would discharge them at the wharf. For these various delays of the ships, beyond the lay days stipulated in the charter parties between claimant and the shipowners, the latter preferred claims for demurrage as provided in the shipping contracts, which the claimant paid, and in this suit seeks to recover of the defendant the several amounts of demurrage by him so paid.
The two shiploads of coal under the contract of June 23 *605 fell 366 tons short of 5,000 tons, and a month after tlie last load was delivered, the claimant, to make up this deficiency, purchased the shortage in the harbor and offered to deliver the same to defendant, but the latter refused to accept it, whereupon the claimant sold it in open market for the best price he could obtain, which fell short of the contract price with defendant, and this item of difference is also included in this suit, claimant insisting upon a right of recovery.
In support of his insistence of his right to demand of the defendant payment of the demurrage paid by him, claimant contends that defendant was bound bj" the custom at San Francisco relative to the stipulations contained in the charter parties, and consequently, in that regard, by thé charter parties also.
By his contracts with the defendant claimant undertook to deliver the coal at the wharf, and at the wharf as customary, at not less than the stipulated rate per day. By the plain terms of the contracts the claimant had as effectually obligated himself to take the coal to the wharf as he had to cross the sea. There is no ambiguity in the contract in this respect, and it needs no interpretation or construction upon this point, and as the actual terms employed in a written contract afford the most certain and determinate evidence of the intentions of the parties, usage is not admissible to contradict or supersede the positive and definite provisions secured thereby (Bliven v. N. E. Screw Co., 23 Howard, 431), but only to explain whatever is indeterminate in their expression. Besides, the presumption is that when the terms of a contract are reduced to writing, and are inconsistent with usage, the parties agree to waive the usage. (Story on Contracts, 649 et seq.) It is not admissible, by showing usage, to add to or engraft upon the contract new stipulations, nor to contradict those which are plain. (Oelricks v. Ford, 23 Howard, 63; Insurance Cos. v. Wright, 1 Wall., 471; Hearne v. Insurance Co., 20 Wall., 492; National Bank v. Burkhardt, 100 U. S., 692.) At most, it can only be said of the custom at San Francisco to insert certain stipulations in the charter party concerning lay days and demurrage, and the obligation of consignee to supply wharfage, that it was a local custom or usage, and relative to *606 such a usage the Supreme Court said in Barnard v. Kellogg (10 Wall., 390):
“The proper office of a custom or usage in trade is to ascertain and explain the meaning and intention of the parties to a contract, whether written or in parol, which could not be done without the aid of this extrinsic evidence. It does not go beyond this, and is used as a mode of interpretation on the theory that the parties know of its existence and contracted with reference to it.' It is often employed to explain words or phrases in a contract of doubtful signification or which may be understood in different senses, according to the subject-matter to which they are applied. But if it be inconsistent with the contract or expressly or by necessary implication contradicts it, it can not be received in evidence to affect it. ‘Usage,’ says Lord Lyndhurst, ‘may be admissible to explain what is doubtful; it is never admissible to contradict what is plain.’ And it is well settled that usage can not be allowed to subvert the settled rules of law. Whatever tends to unsettle the law and make it different in the different communities into which the State is divided leads to mischievous consequences and embarrasses trade and is against public policy. If, therefore, on a given state of facts, the rights and liabilities of the parties to a contract are fixed by the general principles of the common law, they can not be changed by any local custom of the place where the contract was made. * * * ‘A contrary doctrine,’ says the court in Thompson v. Ashton (14 Johnson, 317), ‘would be extremely pernicious in its consequences and render vague and uncertain all the rules of law on the sale of chattels.’”
It follows, therefore, from the views we have expressed, that claimant undertook the burden of delivering the coal at the wharf, and at the wharf as customary, and that the only custom the contract related to was such as prevailed at the port of delivery, and there it Avas n'ecessary to the due performance of the terms of his contract to arrive at the wharf, and the intervening delays, without fault of the defendant, were as the common incidents of the voyages, the losses in consequence of which he possesses no right of action against the defendant. Relative to the failure of some of the ships to discharge cargo as rapidly as the contract required after reaching the wharf, it does not appear this was the fault of defendant, and for the increase of lay days so occasioned there is no remedy. If fault there was, it was that of the shipmaster.
*607 Neither was defendant bound to accept the 366 tons of coal purchased by claimant in the harbor a month after the delivery of the last ship cargo. The language, “ about 6,000 tons,” was that of the vendor, he having introduced it into the contract, and should be most strongly construed against him. (Chitty on Contracts, 136 and notes.) What was meant by the contract in this respect was that the claimant proposed to and did sell two shiploads of coal, the ships having the combined capacity of about the quantity of coal specified. Such, clearly, was the intention of the parties to the contract. (Brawley v. United States, 96 U. S., 171.) The two ships arrived and their cargoes were delivered, and so the contract was fully executed before the 366 tons were purchased or offered.
From the views we have expressed it follows the petition should be dismissed, and it is ordered accordingly.