Williams, Judge,
delivered the opinion:
The plaintiff and the United States, represented by the Director General of Railroads, entered into two contracts, dated November 8, 1918, and November 9, 1918, known as L. M. R. 4-8 and 4-9, in each of which the plaintiff agreed to construct and deliver to the defendant two twin-screw tunnel towboats. The two contracts are identical in provisions, except as to dates.
The plaintiff in this suit seeks to recover on three separate claims aggregating $45,594.94, alleged to be due it under the contract. The first and second of its claims, amounting to $18,949.59, are conceded by the defendant to be due the plaintiff, and need not be discussed.
The third claim, known in the record as the claim for “ excess steel,” amounting to $26,645.35, is the only contested claim arising under these contracts.
The plaintiff’s bid was made in response to a letter from an authorized representative of the defendant, in which the general dimensions of the boats were given, and a statement was made to the effect that the amount of steel required in each boat would be, approximately, plates 430,000 pounds, shapes 240,000 pounds, and rivets 50,000 pounds. The plaintiff prior to making its bid conferred with naval architects of the Government in reference to the amount off steel that Avould be required in each boat and was assured that the amount would be approximately that stated in the letter received by plaintiff inviting its bid.
The contract provided that the plaintiff would build the boats for $360,000 each, half to be allocated to the hull and *541 half to machinery installation. The controversy in suit arises under the provision for the payment of hull construction, which reads:
“ Payments on account of hull construction, total amount one hundred eighty thousand dollars ($180,000), less the estimated cost of steel, twenty-three thousand five hundred dollars ($23,500) for each towboat.
“ The Director General agrees to furnish to the contractor at the point of purchase by the Director General such steel material as he shall be directed by the contractor to furnish, at the price and in the amounts and at the times substantially as shown in the schedule marked ‘ Specifications for the Construction of a Twin Screw Steel Tunnel Towboat for Mississippi Eiver, Addition No. 2 to Contract,’ which is hereto attached and hereby made a part hereof, as fully as though set forth herein. * * * For the purpose of computing the amounts to be paid by the Director General direct to the contractor in advance of completion of the towboats herein referred to, the deduction from the purchase price for the estimated cost of such steel is figured at twenty-three thousand five hundred dollars ($23,500) for each towboat.”
The contract provided that the Director General should furnish the steel required in the construction of the boats at prices fixed by the American Iron and Steel Institute, as of October 1, 1918, and that the prices so fixed should be deducted from the contract price of the boats.
Addition No. 2 to the contract, referred to above, showed the steel required in the construction of each boat, consisting of plates, shapes, flats, and rounds, exclusive of rivets, to be 338 short tons. Upon the basis of prices as of October 1, 1918, the cost of steel, which it was estimated would complete the boats, and which the defendant had a right to deduct from the purchase price was $23,500.
It became evident soon after the plaintiff started the construction of the boats that 338 short tons of steel were wholly inadequate for completion of the boats in accordance with the plans and specifications, and the 'many changes in design, made from time to time by the defendant as the work progressed. It was soon found, also, that it was more convenient and more expeditious for the plaintiff to buy certain of the steel direct, than to have it furnished by the Govern *542 ment, and the naval architects authorized the plaintiff, subject to certain restrictions, to buy a part of the steel required direct. Pursuant to the authorization, plaintiff purchased and paid for large amounts of steel. In view of the enormous increase in the amount of steel necessary to complete the boats, over that estimated in the contract, and the heavy financial burden which the direct purchase of large amounts of steel imposed on it, the plaintiff entered into negotiations with the defendant looking to an adjustment of the matter. At a conference held on August 17, 1920, the-matter of the excess steel required in the construction of the boats, and numerous other matters not involved in this suit, were discussed by plaintiff and representatives of the Government. As a result of these negotiations an agreement, was reached by the parties as to the excess steel, which agreement is referred to in the record as the supplemental agreement, the pertinent provisions of which are:
“Addition No. 2 to contract calls for 338 tons of steel invoice weight. It is ascertained that to complete the boats on the above contract, 559 tons of steel will be required, the excess steel 221 tons requiring 16.6 tons of rivets. On the total excess steel and rivets you will be allowed additional compensation at the rate of $264 per ton, less the value of the scrap on excess steel, or a total of $62,284.20 per boat and for the contract $124,568.80.”
The amount of steel required and actually used in the construction of the boats was 582.62 tons per boat, or 23.62 tons; per boat in excess of the 559 tons “ ascertained ” to be required in the supplemental agreement of August 17. The cost to the plaintiff of installing this excess steel, together with rivets, in the four boats covered by the contract, after deducting the proper allowance for scrap, was $26,645.35.
The issue for decision is the plaintiff’s right to recover this amount. Determination of the question involved hinges on the construction and meaning of the supplemental agreement of August 17. Was this agreement, as the Government contends, a lump-sum settlement for any and all steel which might be required in the construction of the boats, or did it, as the plaintiff contends, merely fix the price of excess steel *543 required to complete the boats over the amount estimated in the original contracts, and provide for the payment of such excess up to 559 tons per boat ?
We think the supplemental agreement should be construed in the light of the negotiations leading up to it, the circumstances and facts surrounding its execution, and the results sought to be attained by the respective parties at the conference when the agreement was reached. It is clear that at the time the original contracts were entered into neither the Government nor the plaintiff had even approximate knowledge of the amount of steel that would be required in the construction of the boats. Certainly the plaintiff had no knowledge of the amount that would be required, and had to rely wholly upon estimates furnished by the Government. The plaintiff’s bid was predicated upon the Government’s representation that 338 tons of steel would be used in the construction of the boats. This representation was grossly inaccurate and misleading. Since the Government, under the contracts, was to furnish all the •steel required, and its cost price as of October 1, 1918, was to be deducted from the purchase price of $180,000 per hull which plaintiff was to receive, the representation that 338 'tons of steel would complete the boats was vital and material, and goes to the very heart of the contract. The plaintiff was to receive $180,000 each for the construction of the four hulls, less $23,500, the cost of 338 tons of steel which the Government represented would be used in their construction. We think a fair interpretation of these contracts is that ■plaintiff agreed that it would put 338 tons of steel in the hulls of the boat it was building for the Government at a cost price of $156,500 per hull. That is undoubtedly what plaintiff at the time it signed the contracts thought, and had a right to think, it was obligating itself to do. The enormous variation from the amount of steel the Government represented would be required, and that actually required to complete the boats, amounted to a material change in the provisions of the contract fixing the plaintiff’s compensation. Its compensation was fixed on the amount of service required in the ■erection and fabrication of 338 tons of steel. The plaintiff *544 was not obligated under the contract to place more than 338 tons of steel in each of the four hulls, but when it elected to proceed with the work, and rendered the greatly increased service of placing almost twice the amount of steel called for in the contract, and the defendant permitted it. to do so, and accepted the benefits arising from its services, the Government became liable on an implied contract to compensate the plaintiff for the fair and reasonable value of' the services rendered. United States v. Spearin, 248 U. S. 132; Hollerbach v. United States, 233 U. S. 165; Roberts v. United States, 92 U. S. 41.
It was not necessary for ,the plaintiff to obtain a supplemental agreement providing for compensation for the- “ excess steel ” to entitle it to recover in that respect. The-motive actuating plaintiff in seeking the supplemental agreement was its immediate and urgent need for funds to continue the work on the boats. At the time the conference was held which resulted in the agreement, plaintiff' had only been paid for the erection and fabrication of 338-tons of steel in each of the four boats. It had been put to the expense of placing in each boat steel largely in excess-, of that amount. It had also bought and paid for a large-amount of steel for which it had not been reimbursed. Plaintiff was not so much concerned about the quantity of steel, that would ultimately be required to complete the boats as it was in securing the payment of money then due it.
At the time of the conference the boats were far from, complete, and many changes in the plans requiring increased amounts of steel were made by the defendant subsequent to that time. Neither the plaintiff nor the naval architects-knew at the time the supplemental agreement was entered' into, and from the very nature of the circumstances could not know how much steel would be required to complete the-boats. The evidence clearly shows, and we have found,, that no ascertainment was made at the time the supplemental agreement was entered into that 559 tons of steel per boat, would complete them. The recitation in the supplemental agreement, “it is ascertained that to complete the boats- * * 559 tons of steel will be required,” was unques *545 tionably based, on the report of the defendant’s auditor, made immediately prior to the time of the conference, that 559 tons of steel per boat had at that time been received at the yards of the plaintiff’s plant or had been ordered for use in the boats.
The defendant challenges the competency of plaintiff’s testimony concerning the negotiations preceding the supplemental agreement, and that relating to the question as to whether or not a final determination was made by the parties as to the amount of steel that would, in fact, be required to complete the construction of the boats, on the ground that a written instrument, plain and unambiguous in its terms, may not be contradicted by parol testimony. There is no question as to the correctness of this rule of the law, but the courts have uniformly recognized the competency of parol testimony for the purpose of showing the intent of the parties, where the whole of a written instrument is fairly susceptible of two constructions. As has been stated, the' plaintiff is here contending the supplemental agreement was merely a settlement for steel which had already been fabricated and erected together with steel which was at the time on the plaintiff’s yards, ready to be used in the' boats, and steel then under order, amounting in all to 559 tons per boat, while the defendant contends it was a lump sum and final settlement for all steel that might be required in the completion of the boats, on the basis of payment for 559 tons, without regard to what amount of steel might, in fact, be required.
We think the supplemental agreement standing alone might be susceptible of either of these constructions, but when the language of the instrument is considered in the light of the negotiations which preceded it, and the facts and circumstances shown to exist at the time it was executed, the conclusion is justified that it was not, and was not intended by the parties to be, a lump-sum final settlement for any and all steel that might go into the construction of the boats in excess of 338 tons per boat.
The agreement nowhere provides that the sum paid plaintiff under its terms shall be payment in full of its claim for *546 any and. all excess steel, and the inference is plain that it was intended to be a settlement for excess steel already fabricated and put in the boats, together with the amount of steel then in plaintiff’s yards ready to be fabricated and used, and steel under order, all of which amounted to 559 tons per boat, the exact tonnage for which plaintiff was paid. This construction of the contract seems inescapable when it is further considered that at the time it was made and entered into plans and specifications for the completion of the boats were not finished, and that many changes in them were made thereafter requiring additional steel, and that neither the plaintiff nor the defendant knew, or could know, at that time even approximately, how much steel would ultimately be required to build the boats.
In Noonan v. Bradley (9 Wall. 401), the court said:
“ If there were any doubt as to the construction which should be given to the agreement of the intestate, that construction should be adopted which would be more to the advantage of the defendant, upon the general ground that a party who takes an agreement prepared by another, and upon its faith incurs obligations or parts with his property, should have a construction given to the instrument favorable to him, and on the further ground that when an instrument is susceptible of two constructions — the one working injustice and the other consistent with the right of the case— that one should be favored which standeth with the right.”
The equities of the case are strongly with the plaintiff— he “ standeth with the right.” The defendant prepared both the original and the supplemental contracts. The estimates made by the Government in its letter soliciting the plaintiff’s bid and in the contract, as to the amount of steel required to build the boats, were so inaccurate and inadequate that they amounted to misrepresentations as to this part of the work. Had the supplemental agreement not been entered into, and the plaintiff were here prosecuting its suit on the original contract, it would clearly be entitled to recover the full amount of its claim. It has rendered the defendant extra services over and above the amount it has been paid of the value of $26,645.35, which it is entitled to1 recover unless it is precluded from doing so by reason of the supplemental *547 agreement, adopting to tbe agreement tbat construction most advantageous to plaintiff.
We hold the supplemental agreement of August 17 was not a lump sum and final settlement for any and all excess steel that might be used to complete the boats over 338 tons per boat, but was an adjustment and settlement for the amount of steel already used in the construction of the boats, together with the amount of steel then on hand at the plaintiff’s plant, and the steel then under order, amounting in all to 559 tons per boat.
This is the construction the Government placed on the supplemental agreement prior to the bringing of this suit. At the conclusion of the contract it appeared, through an error, that less than 559 tons of steel had gone into the building of the boats. Thereupon the Chief of the Inland and Coastwise Waterways wrote plaintiff:
“ In addition to the saving in steel it is found that there is an additional credit due the Government of $6,710.80 for the reason that the total quantity of steel entering into the construction of each boat is 535.2 tons instead of 559 tons as was expected at the time the supplemental agreement was written covering extra steel on this agreement.”
While the interpretation placed upon the supplemental agreement by the Government, through a responsible officer having to do with the work, is not conclusive as to what is the proper construction of the agreement, it is entitled to consideration because it is a contemporaneous construction of the contract by one party; concurred in by the other.
In District of Columbia, Appt., v. GaMaher, 124 U. S. 505, the court said:
“ We think that the practical construction which the parties put on the terms of their own contract, and according to which the work was done, must prevail over the literal meaning of the contract, according to which the defendant seeks to obtain a deduction in the contract price.”
Moreover, we think plaintiff would be entitled to recover even though it be held the supplemental agreement was intended as a final settlement for excess steel.
*548 The amount of excess steel required to complete the boats as stated in the agreement was so grossly inadequate and misleading that it relieved the plaintiff of any obligation to put any steel in the boats in excess of 559 tons, and when, with the defendant’s consent, and in accordance with plans and specifications furnished it by the Government it proceeded to do so, the Government became liable to the plaintiff for all excess steel placed in the boats over 559 tons. Hollerbach v. United States, supra; Roberts v. United States, supra.
The plaintiff in its replication and answer to the defendant’s answer and counterclaims asserts a claim for $2,120, withheld from the plaintiff and deducted by the Government as liquidated damages on account of the alleged delay of plaintiff in completing the construction of certain barges under a contract with the United States Shipping Board Emergency Fleet Corporation, dated August 1, 1918. We have found as a fact (Finding XYI) that the barges called for under this contract were all completed within the time specified in the contract. Consequently, the liquidated damages in the amount stated were erroneously assessed against the plaintiff and were wrongfully deducted from the amount due plaintiff under that contract.
The plaintiff is entitled to recover the sum of $47,714.94, made up of the following items:
Amount admitted, but withheld (Finding XIX)_$12,550.97
Savings on steel (Finding XIII)- 6,398.62
Excess steel (Finding XII)- 26,645.35
Liquidated damages (Finding XVII)- 2,120.00
The findings show that the defendant is entitled to recover on its counterclaims (Findings XX-XXI) the sum of $23,591.24, which amount the plaintiff in its brief concedes to be due the defendant.
Judgment is therefore awarded the plaintiff in the sum of $24,123.70. It is so ordered.
Whaley, Judge; Littleton, Judge; Green, Judge; and Booth, Chief Justice, concur.