**FLOUR MILLS OF AMERICA, Inc. v. UNITED STATES.**

**INTERNATIONAL MILLING CO. v. SAME.**
**ISMERT–HINCKE MILLING CO. v. SAME.**

**MOORE–LOWRY FLOUR MILLS CO. v. SAME.**

**RODNEY MILLING CO. v. SAME.**
Nos. 46450–46454.

Court of Claims.
July 7, 1947.

Temple W. Seay, of Washington, D. C. (Phil D. Morelock and Joseph A. Hoskins, both of Kansas City, Mo., on the brief), for plaintiffs.

Horace G. Marshall, of Chicago, Ill., and John F. Sonnett, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and JONES, MADDEN, WHITAKER and LITTLETON, Judges.

JONES, Judge.

The issue in each of these consolidated cases is whether the plaintiff is entitled to recover carrying charges on flour shipped under contract to the Federal Surplus Commodities Corporation.

The contract called for shipments of large quantities of flour over a stated period. They were part of a program for supporting the price of wheat. The flour was purchased to remove surplus wheat from the ordinary channels of trade and to provide food for people who were on relief. Each of the contracts provided for payment by defendant of storage charges in the event of delay in giving shipping instructions.

The plaintiffs claim that the storage charges should be dated and paid from the end of the grace period—21 days—follow-

ing the contemplated weekly shipments, while the defendant claims that such charges should begin 21 days after the final specified delivery date.

Each of the plaintiffs is a domestic corporation, engaged in the flour milling business. During the year 1940 the plaintiffs entered into contracts with the Federal Surplus Commodities Corporation, an agency of the United States Government, operating under the direction of the Secretary of Agriculture, whereby plaintiffs contracted to sell and deliver the flour to such Corporation.

Prior to entering into the contracts, each of the plaintiffs received an announcement describing the contemplated purchase of flour by the Federal Surplus Commodities Corporation, hereinafter referred to as FSCC. The announcements stated that all purchases would be made subject to the terms and conditions stated in the offer of sale, copies of which were attached to the announcements.

The announcements were identical in terms and read in part as follows: Delivery must be made by mills during the period beginning . . . . . . . . . . . and ending November 30, 1940. All offers submitted must specify the maximum quantity to be delivered during any one calendar week.

The date of the beginning of the delivery period varied from June 17 to July 1, 1940, in the different contracts. The end of the delivery period was uniformly November 30, 1940. The defendant prepared all the documents including the announcement and blanks for both offer and acceptance. It fixed the dates for the beginning and the end of the delivery period. The plaintiffs filled in the amount they were willing to offer and the maximum amount they would deliver each week.

Plaintiffs submitted offers of sale. A typical one read in part as follows:

Section II. Delivery.

1. It is agreed that delivery will be made during the period beginning June 24, 1940, and ending November 30, 1940, in accordance with shipping instructions issued by FSCC, provided that the quantity that we may be required to deliver during any one calendar week, regardless of the total quantity accepted, shall not exceed 9,000 barrels.

2. Carrying Charges: It is understood that if FSCC fails to furnish delivery instructions directing the delivery of flour during the period as set forth in Section II hereof, we shall be allowed carrying charges for such flour remaining unshipped at the rate of $\frac{1}{6}$ of 1¢ per barrel (196 lbs.) per day beginning on the 21st day after date of expiration of the delivery period and ending on the day preceding the date of actual delivery of flour to the FSCC provided delivery is made as directed by FSCC.

The several offers differed only slightly in delivery dates, but varied widely in amounts to be delivered, ranging from 123,500 barrels by Rodney Milling Company to 2,100,000 barrels by the International Milling Company.

A signed copy of each offer of sale accepted by the defendant was returned to plaintiffs with a letter of transmittal which read in part as follows: The Corporation will furnish shipping instructions in sufficient time to enable you to make deliveries in accordance with the delivery schedule as set forth in your contract. It is suggested that you not plan any milling schedules prior to receipt of such instructions.

The announcement had stated "Delivery must be made during the period beginning . . . . . . . . . and ending November 30, 1940," and the instructions which accompanied it contained the following: 1. Insert period during which deliveries will be made. Such period shall begin not earlier and end not later than the dates specified in the announcement accompanying this form. Also show the maximum quantity which will be delivered during any one calendar week.

These offers of sale were submitted by the plaintiffs and accepted by the FSCC in the quantities and for the delivery periods set out in finding 15.

The plaintiffs concluded that the contracts required them to deliver the total quantities during the delivery period and that they would be furnished weekly shipping instructions. They purchased the necessary wheat accordingly, purchased bags for the flour marked in such a way

that they could be used for no other purpose, and signed performance bonds.

The FSCC did not furnish plaintiffs shipping instructions for the flour in equal weekly quantities during the delivery period of each contract and it did not supply such directions in time to permit plaintiffs to ship the flour before the end of the delivery period in any of the contracts. In each of the contracts the final period ended on November 30, 1940, and the grace period expired on December 20, 1940. On each contract there were substantial quantities of flour for which plaintiffs received no shipping instructions until after the expiration of the period of grace. As to other amounts of flour no shipping instructions were ever received, and as to this flour the contracts were cancelled by mutual agreement. We will, therefore, disregard the unshipped portion of any contract.

The plaintiffs contend that the Government was obligated to furnish weekly shipping instructions, and, if it did not do so, to pay carrying charges on a ratable basis beginning 21 days following the week in which particular directions were due but not received.

The defendant contends that under the terms of the agreement the Government was not obligated to pay any charges until December 20, 1940; that is, 21 days after the final delivery period.

L. J. Morgan and L. Thornton Davis handled the details of these transactions for the FSCC. One of them signed each of the acceptances.

A representative of the Millers National Federation repeatedly complained to these men that the plaintiffs had agreed to ship the flour in specified quantities per week; that under the terms of the contract they had a right to expect shipping instructions on a weekly basis, and that failure of the FSCC to provide shipping instructions on that basis was causing loss and damage to the plaintiffs. In reply Morgan stated that it was his expectation that the flour would be taken out in substantially the same weekly quantities as provided in the contracts, but that a break-down in relief distribution had made this impossible. Both Davis and Morgan told the representative of the Mil-

lers National Federation that they saw no reason why carrying charges should not be paid to plaintiffs on the basis of the Government's failure to supply weekly shipping instructions as contemplated.

Davis and Morgan worked under the supervision of H. C. Albin, in a section which had the responsibility for buying grain and grain products. Both Morgan and Davis had authority to and did sign the contracts with plaintiffs as purchasing agents of the FSCC. Before going to the Department of Agriculture Morgan had been connected with the flour milling industry and because of that experience he was given the responsibility for handling many of the details of the flour-purchase program. However, neither Davis nor Morgan had authority to determine FSCC policies. These were determined by Albin, the Chief of the Division, and the directors of the various commodity branches in consultation with the head of the agency.

There can be no doubt that plaintiffs interpreted the contracts to mean that they were required to be ready to make weekly shipments and that they would be paid storage charges on such basis in the event of failure to receive such instructions, and that they made their plans and purchases accordingly. Those who signed for the Government held the same viewpoint. However, when plaintiffs submitted claims for such storage charges, H. C. Albin, the Chief of the Division, referred the matter to the General Accounting Office, which rejected the weekly storage basis. Albin, at the hearing, interpreted the contracts in the same manner as did the General Accounting Office. However, previously thereto, on September 27, 1940, he had written one of the plaintiffs the following letter: You advise that this flour was booked for scheduled shipment from July 1, 1940, to November 30, 1940, inclusive. When these purchases are made it is necessary, as you know, due to rate advantages, location of the mill and other factors to allocate certain destinations to each mill and therefore it is almost *impossible to supply shipping directions exactly as scheduled.* There are times when the consignee's requests from these certain destinations are delayed and it is not always possible to do

anything to relieve the situation, and until these requests are received there is nothing we can do; however, everything possible is being done to supply you with directions as fast as possible. [Italics supplied.]

\*    \*    \*    \*    \*    \*

In accordance with the custom prevailing in the milling trade the plaintiffs purchased the wheat necessary for carrying out these various contracts. For this purpose the International Milling Company purchased wheat at a cost of $2,000,000 and $185,000 worth of the specially marked bags. The other companies, having smaller contracts, purchased ratably less. The wheat occupied varying percentages—ranging from 27 to 66 percent—of the storage capacity of the different plaintiffs. It was necessary for one company to install some new equipment and make some changes in four of its mills in order to meet the extensive requirements of its contract with the FSCC. Performance bonds were also furnished as required by the defendant.

When all the memoranda, letters, statements and circumstances are taken into consideration, we cannot escape the conclusion that the plaintiffs were entitled to receive some sort of weekly instructions, failing which the Government was obligated to pay the minimum of the storage charges in accordance with the terms of the contract. To construe the contracts in such a way as to permit the defendant to sit idly by and have no obligation whatever to issue any shipping instructions until 21 days after the final delivery period, which is the final upshot and resting place of defendant's argument, would be a strained construction of the various memoranda, letters, and facts of the respective cases.

It will be noted that the delivery period began in June and ended November 30, 1940, but the defendant, in the instructions accompanying its announcement, directed plaintiffs to insert the maximum quantity which would be delivered in any one week, thus clearly showing that weekly shipments were contemplated. It will also be noted that in the same sentence of the memorandum which set out the extent of the delivery period, it is stated that deliveries should be in accordance with shipping instructions issued by the FSCC, provided that the quantity to be delivered during any one calendar week should not exceed a certain number of barrels. In the second paragraph of Section II, under the heading of "Delivery" and a subheading of "Carrying Charges" it is stated that "it is understood that if FSCC fails to furnish delivery instructions directing the delivery of flour during the period *as set forth* in Section II hereof" storage charges will be paid at the rate of $\frac{1}{8}$ of $1\cent$ per barrel beginning on the 21st day after date of expiration of the delivery period. [Italics ours.]

The defendant claims that this language is very clear and does not admit of any other construction than that the charges should begin only after the 21st day following the final delivery date. The plaintiffs place the opposite construction on the language, and assert that if this is not the proper construction then the language is not clear and should be construed in the light of the intention of the parties.

If the language were as clear as the defendant claims, it would seem strange that we should have so much argument, briefing and conversation as to what is the proper construction of the language involved.

■ It is a cardinal rule of construction of contracts that the court will, if possible, ascertain and give effect to the mutual intention of the parties. Chesapeake & Ohio Canal Co. v. Hill, 15 Wall. 94, 21 L.Ed. 64; Great Northern Ry. Co. v. United States, 8 Cir., 236 F. 433.

The language of the contract in regard to the carrying charges is not altogether clear. This fact makes it necessary to consider the customs and practices of the trade in arriving at the intention of the parties to the contracts. Davis and Morgan were the officials who had handled the details of the contracts. They had signed the acceptances for the defendant. The letters transmitting the acceptances, however, were signed by H. C. Albin, the Chief of the Division. Morgan understood the customs of the milling trade, and had been entrusted by the Chief of the Division with

the task of working out the arrangements. Taking all these matters together we have no doubt of the intention of the parties.

In looking over the entire record we cannot escape the conclusion that it was the mutual intention of the parties that delivery should be had on a weekly basis, and that some weekly instructions would be given in carrying out the respective contracts. The facts preclude any other reasonable construction.

The Supreme Court of the United States in the interpretation of contracts has uniformly recognized the importance of custom and usage in the particular industry as applicable to contractual arrangements. In Hostetter v. Park, 137 U.S. 30, 40, 11 S. Ct. 1, 4, 34 L.Ed. 568, the court used the following language: "It is well settled that parties who contract on a subject-matter concerning which known usages prevail incorporate such usages by implication into their agreements, if nothing is said to the contrary."

In Moore v. United States, 196 U.S. 157, 25 S.Ct. 202, 49 L.Ed. 428; Id., 38 Ct.Cl. 590, it was held that usage may be resorted to in order to make definite what is uncertain, clear up what is doubtful, or annex incidents, which do not vary the terms of the written contract. The customs and practices of the milling trade which were familiar to the officials who signed for both parties to the agreements bear out the construction placed on the contracts by the plaintiffs.

It has even been held that memoranda and letters and partial statements may be out a part of a larger and more comprehensive contract the terms of which may be disclosed by parol testimony if it does not contradict any of the written instruments. However, it is not necessary to go this far in order to arrive at the intention of the parties in these cases.

■ These contracts in so far as they are in written form were prepared by the defendant, which may be considered in construing them. Phoenix Insurance Co. v. Slaughter, 12 Wall. 404, 20 L.Ed. 444; Marietta Manufacturing Co. v. United States, 73 Ct.Cl. 528.

■■ The announcement which formed a part of the contract stipulated that "Delivery must be made by mills during the period beginning ........ and ending November 30, 1940. * * *" This with the other instruments and the performance bond made it an enforceable obligation as against the plaintiff. An essential element of a contract is mutuality. There must therefore be a corresponding obligation on the part of the defendant. This corresponding obligation may be express or implied. Butler v. Thomson, 92 U.S. 412, 23 L.Ed. 684. The plaintiffs were obligated to deliver all of the flour before November 30, 1940. Since this is true, in order for this to be done, defendant should have given notice prior to that time even though some of the flour was actually to be shipped later. Otherwise defendant could relay instructions indefinitely and incur no penalty other than the storage charge, while plaintiffs would have been required at all times to be ready to make delivery. By every rule of reason as well as every tenet of fair construction, obligations must be mutual. If this were a contest between individuals we would not hesitate to apply the doctrine of mutuality. Since the Government has given its consent to be sued in this type of case, we can see no plausible reason why it should be treated as a favored litigant.

In Sacramento Navigation Company v. Salz, 273 U.S. 326, 329, 47 S.Ct. 368, 369, 71 L.Ed. 663, the court uses the following language: "But a contract includes, not only the promises set forth in express words, but, in addition, all such implied provisions as are indispensable to effectuate the intention of the parties and as arise from the language of the contract and the circumstances under which it was made. 3 Williston on Contracts, § 1293."

A similar comment is contained in 17 C. J.S., Contracts, § 328, as follows: "A contract includes not only what is expressly stated but also what is necessarily to be implied from the language used; and terms which may clearly be implied from a consideration of the entire contract are as much a part thereof as though plainly written on its face. In the absence of an ex-

press provision therefor, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made, and to refrain from doing anything which will destroy or injure the other party's right to receive the fruits of the contract."

To construe these contracts in such a way as to require plaintiffs to use up their storage capacity and be put to the expense of being ready to make delivery, including the signing of a performance bond, and yet with no obligation on the part of the defendant to give any weekly instructions until the entire delivery period had elapsed, plus 21 days of grace, would reach manifestly unjust results.

On the other hand, we cannot agree with the contention of the plaintiffs that the Government was required to order the delivery of the flour on an equal weekly basis. This would nullify the provision which limited the maximum amount which might be ordered in any one week. Manifestly the defendant had the right to defer action until such time as the maximum amount ordered in each of the last weeks of the delivery period would absorb the amount which was covered by the contract. Therefore, in arriving at a conclusion we are allowing the plaintiffs to recover only the carrying charges beginning 21 days after the weekly delivery periods, assuming that the defendant would exercise its right to order the maximum weekly deliveries in each of the latter weeks of the delivery period. This construction applies to all the plaintiffs' cases except that of the International Milling Company. In respect to the construction of this company's contract the memorandum itself set out equal weekly deliveries covering $\frac{1}{24}$ of the quantity accepted on one series of the contracts, and $\frac{1}{23}$ of the quantity accepted on the other contracts which that company had with the defendant.

The respective plaintiffs are entitled to recover from the defendant as follows:

Flour Mills of America, Inc., $12,663; The International Milling Company, $72,117.36; The Ismert-Hincke Milling Company, $553; The Moore-Lowry Flour Mills Company, $12,590.20; Rodney Milling Company, $4,887.96.

It is so ordered.

MADDEN, WHITAKER, and LITTLETON, Judges, concur.

WHALEY, Chief Justice, took no part in the decision of this case.